**LINEA AREA NACIONAL de CHILE S.A., d/b/a Lan–Chile Airlines, Plaintiff,**

v.

**Chris SALE, Acting Commissioner of the Immigration and Naturalization Service, United States Department of Justice, Defendant.**

Civ–No. 93–CV–2658.

United States District Court, E.D. New York.

Sept. 14, 1994.

Celestino Pena, Whitestone, NY, David Coburn, Steptoe & Johnson, Washington, DC, for plaintiff.

Scott Dunn, Sp. Asst. U.S. Atty., Brooklyn, NY, for defendant.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

Before the court is a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 by plaintiff Linea Area Nacional de Chile S.A. d/b/a Lan–Chile Airlines ("Lan–Chile"), and the cross-motion for summary judgment by defendant Chris Sale, Acting Commissioner of the Immigration and Naturalization Service, United States Department of Justice ("INS" or the "Service"). At issue is a policy of the INS which holds carriers such as Lan–Chile responsible for

detaining certain excludable aliens pending resolution of their applications for political asylum. For the following reasons, plaintiff Lan–Chile's motion is granted and the cross-motion of defendant INS is denied.

### FACTS

The material facts are not in dispute. Lan–Chile is a corporation organized under the laws of Chile with its principal place of business in Miami, Florida. Complaint, ¶ 4. Lan–Chile is a foreign air carrier authorized by a permit issued to it under Section 402 of the Federal Aviation Act to provide air transportation services between the United States and Chile. *Id.* Lan–Chile operates regularly scheduled flights between various cities in South America and John F. Kennedy International Airport ("JFK Airport") in New York City. Lan–Chile's 3(g) Statement, ¶ 1.

Pursuant to an agreement between Lan–Chile and INS—the "Immediate and Continuous Transit Agreement" (the "Transit Agreement") (Form I–426)[1]—Lan–Chile is allowed to transit aliens through the United States if the aliens carry the appropriate travel documentation establishing permission to enter a country other than the United States. Complaint, Ex. A.[2] Lan–Chile's 3(g) Statement, ¶ 2; INS's Response to Lan–Chile's 3(g) Statement at 2. Aliens who travel through the United States pursuant to Form I–426 are commonly referred to as "transits without visas," or "TWOVs." The typical lay-over at JFK Airport for TWOVs is less than eight hours. Lan–Chile's Reply Memorandum of Law at 20 n. 11.

On September 3, 1990, a group of three aliens presented themselves to Lan–Chile representatives in Santiago, Chile with airplane tickets to travel on a Lan–Chile flight transiting through JFK Airport to Seoul,

---

**1.** The Transit Agreement is a form document which appears to have been last revised on May 5, 1965. *See* 8 C.F.R. § 299.1 (1994).

**2.** Section 212.1(f)(1) of Title 8 of the Code of Federal Regulations provides that "[a] passport and visa are not required of an alien who is being transported in immediate and continuous transit through the United States in accordance with the terms of an agreement entered into between the transportation line and the Service

under the provisions of section 238(d) of the Act [8 U.S.C. § 1228(c)] on form I–426 to insure such immediate and continuous transit through, and departure from, the United States en route to a specifically designated foreign country: *Provided,* That such alien is in possession of a travel document or documents establishing his/her identity and nationality and ability to enter some country other than the United States." 8 C.F.R. § 212.1(f)(1) (1994) (emphasis in original).

South Korea with a layover at JFK Airport. Lan–Chile's 3(g) Statement, ¶ 3; INS's Response to Lan–Chile's 3(g) Statement at 2. When they arrived at JFK Airport, these aliens requested political asylum in the United States,[3] and Lan–Chile was instructed by INS to assume custody of the aliens pending further investigation. Lan–Chile's 3(g) Statement, ¶ 4; INS's Response to Lan–Chile's 3(g) Statement at 2. Lan–Chile then retained a private security firm to guard the aliens in a motel. Lan–Chile's 3(g) Statement, ¶ 5; INS's Response to Lan–Chile's 3(g) Statement at 2.

On October 22, 1990, and December 19, 1992, a group of six aliens and nine aliens, respectively, arrived at JFK Airport on a Lan–Chile carrier with documentation evidencing an intent to travel to Seoul, South Korea. When they arrived at JFK Airport they also requested political asylum. INS ordered Lan–Chile to assume custody of these aliens. They were delivered to the private security firm for detention and placed under 24–hour armed guard. The aliens who arrived on September 3, 1990 and December 19, 1992, were detained by Lan–Chile for "several months" before they were paroled by INS. Affidavit of Pablo Cuevas (Station Manager for Lan–Chile at JFK Airport), August 27, 1993, ¶ 7; Affidavit of John Zulueta (former Station Manager for Lan–Chile at JFK Airport) ("Zulueta Aff'd"), August 17, 1993, ¶ 7. The aliens who arrived on October 22, 1990, remained in detention for approximately four months until paroled by INS. Lan–Chile's 3(g) Statement, ¶ 8; INS's Response to Lan–Chile's 3(g) Statement at 2–3. During the time period in which the nine aliens who arrived on December 19, 1992,

were detained by Lan–Chile under armed guard, several escaped and others required medical attention at a hospital. Zulueta Aff'd, ¶ 7. On at least one occasion, two of the aliens ordered by INS to be detained by Lan–Chile overpowered one of the private security guards and had to be chased through the streets of New York City. Affidavit of David H. Coburn ("Coburn Aff'd"), September 2, 1993, ¶ 4.

In accordance with the INS's instructions for detention, Lan–Chile paid for the hotel rooms, the private security guards, and food for the detained aliens. Coburn Aff'd, ¶ 3. Lan–Chile also arranged for medical attention when needed. Letter from David H. Coburn to Edward Grant, INS, March 8, 1993 at 1 (Plaintiff's Motion for Summary Judgment, Ex. 3). Lan–Chile has expended several hundred thousand dollars in fees to the private security firm and the motel in response to the INS's detention order. Coburn Aff'd, ¶ 6; Lan–Chile's 3(g) Statement, ¶ 17.[4]

On or about June 15, 1993, Lan–Chile served and filed its complaint. Lan–Chile seeks (i) a declaration that INS's policies, which assign responsibility to Lan–Chile for the detention of these aliens pending the processing of their political asylum applications, exceeds INS's statutory authority and are in violation of the Administrative Procedure Act (the "APA"), and that INS is responsible for assuming custody and paying all expenses incurred in detaining these aliens (Count I); and (ii) a declaration that these policies are arbitrary and capricious and in violation of the APA (Count II). Plaintiff also seeks an order requiring INS to "reimburse Lan–Chile for amounts that Lan–

---

3. Section 1158(a) of Title 8 of the United States Code provides that "[t]he Attorney General shall establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." 8 U.S.C. § 1158(a).

4. INS entered into an October 15, 1991 settlement agreement with Lan–Chile and the private security firm in which INS agreed to pay for the

firm's services if within 18 months of the settlement agreement a court in subsequent litigation overturned INS's policy concerning the detention of TWOVs such as the aliens detained by Lan–Chile. Suit was filed by certain domestic air carriers to overturn the INS policy in *Air Transport Association of America v. McNary*, Civil Action No. 92–181 (NHJ) (D.D.C.). Plaintiff's motion for summary judgment, filed January 22, 1992, is still pending. Because the 18 month period expired, INS was relieved of its obligation under the settlement to pay the private security firm. Coburn Aff'd, ¶ 7; Lan–Chile's 3(g) Statement, ¶ 19.

Chile has paid or may become obligated to pay ... in connection with the detention of these aliens." Complaint, ¶ 42.

### DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment "shall be rendered forthwith if ... there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In opposing a properly supported summary judgment motion, "an adverse party may not rest upon the mere allegations or denials of [its] pleading, but [its] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The moving party is 'entitled to a judgment as a matter of law' [if] the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

In deciding a summary judgment motion the court need not resolve disputed issues of fact but need only determine whether there is any genuine issue to be tried. *Eastman Mach. Co. v. United States,* 841 F.2d 469, 473 (2d Cir.1988). A genuine factual issue exists if there is sufficient evidence favoring the nonmovant such that a jury could return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. "In assessing the record to determine whether there is a genuine issue of fact, the court is required to draw all

factual inferences in favor of the party against whom summary judgment is sought." *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989).

In this case, the issues are entirely legal and the resolution of the motion and cross-motion turn on a proper interpretation of the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (the "INA"), the relevant regulations promulgated thereunder, and INS's interpretation of the statute, the regulations and the Transit Agreement. Summary judgment, therefore, is appropriate. *Dia Navigation Co. v. Reno,* 831 F.Supp. 360, 365 (D.N.J.1993) (in challenge to INS's policy of requiring vessels to detain stowaways pending their political asylum applications the court converts INS's cross-motion to dismiss into a cross-motion for summary judgement and grants the cross-motion because the "unresolved issues are primarily legal rather than factual") (quoting *Crain v. Board of Police Comm'rs,* 920 F.2d 1402, 1405–06 (8th Cir.1990)), *rev'd on other grounds sub nom., Dia Navigation Co. v. Pomeroy,* 34 F.3d 1255 (3d Cir.1994).

### II. *Statutory Background*

#### A. *8 U.S.C. § 1223*

Prior to 1986, Section 233 of the INA, 8 U.S.C. § 1223, provided that carriers bore the financial responsibility for detaining aliens who were *temporarily* removed for examination and inspection prior to the determination of their eligibility to enter the United States. This section provided in relevant part that "[w]henever a *temporary* removal of aliens is made under this section, the vessels or aircraft ... shall pay all expenses of such removal to a designated place for examination ... and all expenses arising during subsequent detention...." 8 U.S.C. § 1223(b) (1970) (emphasis added) (repealed Pub.L. No. 99–500, 100 Stat. 1783–56 (1986)).[5] Like its predecessor section, Sec-

---

5. Section 1223 provided in relevant part as follows:

(a) Upon the arrival at a port of the United States of any vessel or aircraft bringing aliens ... the immigration officers may order a *temporary* removal of such aliens for examination and inspection.... A *temporary* removal of

aliens from such vessels or aircraft ... shall be made by an immigration official at the expense of the vessels or aircraft or transportation lines....

(b) Whenever a *temporary* removal of aliens is made under this section, the vessels or aircraft ... shall pay all expenses of such removal

tion 1223(b) allowed immigration officials *to* impose on the carrier the duty of safekeeping the alien and maintaining him at the carrier's expense. *Low King Yong v. Pan Am Airways*, 74 F.Supp. 657, 659 (D.Hawaii 1947).

Regulations issued by the Service stated that aliens in the country pursuant to the TWOV program were also to remain in the custody of the carrier during their time in the United States. *See, e.g.*, 38 Fed.Reg. 14962 (June 7, 1973); 8 C.F.R. § 214.2(c)(1) (1973) ("An applicant for admission under the transit without visa privilege must establish that he is admissible under the immigration laws … *Provided,* That until his departure from the United States he shall be in the custody of the carrier which brought him to the United States[.]") (emphasis in original). At one time the regulation provided that the alien could only remain in the United States for eight hours, *id.*, 38 Fed.Reg. 19197–98 (June 29, 1973), but this was amended to allow longer stays, 38 Fed.Reg. 24891 (Sept. 11, 1973), 8 C.F.R. § 214.2(c)(1) (1994) ("if there is no scheduled transportation within that 8–hour period, continuation of the journey thereafter on the first available transport will be satisfactory."). The regulations were explicit that "until his departure from the United States responsibility for his continuous actual custody will lie with the transportation line which brought him to the United States unless at the direction of the district director he is in the custody of this Service or other custody approved by the Commissioner." 8 C.F.R. § 214.2(c)(1) (1973).

Of great significance for purposes of this challenge to the INS policy, however, is the following from Section 214.2(c)(1) which authorizes the transit of TWOVs through the United States:

> The privilege of transit without a visa may be authorized only under the conditions

that the transportation line, without the prior consent of the Service, will not refund the ticket which was presented to the Service as evidence of the aliens's confirmed and onward reservations; *that the alien will not apply for extension of temporary stay or for adjustment of status under section 245 of the Act,* and that until his departure from the United States responsibility for his continuous actual custody will lie with the transportation line which brought him to the United States....

8 C.F.R. § 214.2(c)(1) (1994) (emphasis added). As the undisputed facts outlined above demonstrate, the TWOVs in this action did, in fact, apply for an extension of temporary stay; they requested political asylum.

Regulations regarding aliens other than TWOVs also provided that carriers must accept the responsibility of detaining inadmissible aliens pursuant to transit agreements entered into with the Service. 47 Fed.Reg. 30044–46 (July 9, 1982):

> Where an alien who appears to be inadmissible has arrived aboard a regular carrier which has entered into a contract with the Attorney General under section 238 of the [INA] [8 U.S.C. § 1228(c) ], the placing of aliens in the custody of the carrier, as authorized by section 233 of the [INA] [8 U.S.C. § 1223], will ordinarily satisfy the detention requirements of the statute. In cases where carrier custody appears to be inadequate to protect the safety of the public, or where the security precautions which the carrier will take appear to be inadequate or inappropriate to detain the alien, custody may be assumed by the Service.

*Id.* at 30045. *See also id.* at 30046 (citing a revised 8 C.F.R. § 235.3(d) ("Any alien sub-

---

to a designated place for examination and inspection … and all expenses arising during subsequent detention, pending a decision on the aliens' eligibility to enter the United States....

(c) Any detention expenses … shall not be assessed … against the vessel or aircraft … in the case of (1) [any alien with a valid visa], or (2) [any alien admitted after detention], or (3) [any alien authorized for temporary admission], or (4) [persons claiming U.S. nationality

or citizenship with an unexpired U.S. passport], or (5) [persons claiming U.S. nationality or citizenship with a valid document of identity].

(d) Any refusal or failure to comply with the provisions of this section shall be punished in the manner specified in section 1227(b) of this title [a monetary fine for each violation]. 8 U.S.C. § 1223 (1970) (emphasis added) (repealed Pub.L. No. 99–500, 100 Stat. 1783–56 (1986)).

ject to detention ... may be placed in the custody of the carrier[.]")). As one court recently summarized, in upholding the Service's right to impose the financial obligation of detaining stowaways pending their applications for political asylum, "[h]istorically, the maintenance expenses incident to the inspection, examination, and detention of aliens were borne, pursuant to section 1223, by the commercial carriers responsible for transporting such aliens into this country." *Argenbright Sec. v. Ceskoslovenske Aeroline,* 849 F.Supp. 276, 280 (S.D.N.Y.1994).

### B. *Pub.L. No. 99–591—The Immigration User Fee Statute*

On October 30, 1986, Congress repealed Section 233 of the INA, 8 U.S.C. § 1223, when it passed The Department of Justice Appropriation Act of 1986, Pub.L. No. 99–591, 100 Stat. 1783–56. This act established the Immigration User Fee Statute (the "1986 User Fee Statute" or the "Act") which has been codified in 8 U.S.C. § 1356(d) to (*l*). The 1986 User Fee Statute provided in relevant part that "the Attorney General shall charge and collect $5 per individual for the immigration inspection of each passenger arriving at a port of entry in the United States[.]" 8 U.S.C. § 1356(d). The disposition of these receipts was outlined in Section 1356(h)(2)(A)(i) to (v):

The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for *expenses incurred by the Attorney General* in providing immigration inspection and preinspection services for commercial aircraft or vessels and in—

(i) providing overtime immigration inspection services for commercial aircraft or vessels;

(ii) administration of debt recovery, including the establishment and operation of a national collection office;

(iii) expansion, operation and maintenance of information systems for nonimmigrant control and debt collection;

(iv) detection of fraudulent documents used by passengers traveling to the United States; and

(v) *providing detention and deportation services for excludable aliens arriving on commercial aircraft and vessels.*

(emphasis added).

As the above section indicates, the thrust of the 1986 User Fee Statute is to reimburse the Attorney General for funds she expends in connection with the inspection and preinspection of aliens and the costs associated with their detention and deportation. In repealing Section 1223, "one of the new statute's primary functions was to reverse the existing rule, requiring carriers to bear the expense of detaining aliens pending hearings on their immigration status." *Dia Navigation,* 34 F.3d at 1260. *See also Argenbright,* 849 F.Supp. at 280 ("[The 1986 User Fee Statute] shifted the financial responsibility for the detention and deportation costs of excludable aliens to the INS.").

The enactment of the 1986 User Fee Statute, however, did not result in the repeal of 8 U.S.C. § 1227(a) which provides, in part, that the cost of maintaining an "excluded" alien prior to his or her deportation, including detention expenses, remains upon the carrier responsible for transporting such alien into the United States.[6] The repeal of Section 1223 also had no effect on that section of the INA which authorizes the federal government to enter into contracts with the carriers regarding the continuous transit of passengers through the United States. *See* 8 U.S.C. § 1228(c).

Plaintiff argues that the 1986 User Fee Statute now mandates that INS bear the physical and financial responsibility for detaining TWOVs who seek political asylum upon their arrival in the United States.

---

6. This statute provides in part that,

Any alien ... arriving in the United States who is excluded under this chapter, shall be immediately deported.... The cost of the maintenance including detention expenses and expenses incident to detention of any such alien while he is being detained shall be borne by the owner or owners of the vessel or aircraft on which he arrived [absent certain exceptions].

8 U.S.C. § 1227(a).

Lan–Chile's Memorandum of Law at 10–14. INS, on the other hand, contends that "[b]y repealing 8 U.S.C. § 1223, and modifying 8 U.S.C. § 1222,[7] Congress apparently intended to free carriers in *certain* cases from liability for detention costs for *certain* excludable aliens." INS's Opposition Memorandum of Law at 16 (emphasis added). INS contends that the enactment of the 1986 User Fee Statute did not alter the Service's authority to enter into or continue the transit agreements discussed *supra*. These agreements, it contends, place the physical and financial responsibility of detaining TWOVs pending a determination of their application for political asylum upon the carriers. INS's Reply Memorandum of Law at 9.[8]

■ The term "excludable aliens" referred to in the 1986 User Fee Statute refers to specific classes of aliens who enter the United States. A list of excludable aliens is found in 8 U.S.C. § 1182(a). They include, among others, aliens who are excludable because of health reasons, criminal backgrounds, security risks, risk of becoming a public charge, or stowaways. The statute also provides that,

> Any alien who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or entry into the United States or other benefit provided under this chapter is excludable.

8 U.S.C. § 1182(a)(6)(C)(i). Upon the assumption that the aliens detained by Lan–Chile misrepresented at the outset their intention to travel through the United States to South Korea, they are guilty of fraud or misrepresentation. *United States v. Kavazanjian,* 623 F.2d 730, 738 (1st Cir.1980) ("We agree that the aliens, by arriving as TWOVs with no intention of effecting an orderly and expeditious departure, were guilty of fraud or misrepresentation."). Therefore, pursuant to 8 U.S.C. § 1182(a)(6)(C)(i), the TWOVs detained by plaintiff in this action were "excludable aliens." This point is conceded by INS. INS's Memorandum of Law at 9 ("An alien who obtains TWOV status with the intent of claiming asylum upon his arrival in the United States is held to be excludable from the United States on the ground that he had made a willful misrepresentation of a material fact in procuring his TWOV document.").[9] *See also Aerolineas Argentinas v. United States,* 31 Fed.Cl. 25, 27 (1994) ("A TWOV who violates the TWOV requirements is excludable.").

It is important to note that neither a passport nor a visa is required of a TWOV who comes to the United States for passage through it to a designated foreign country. All that is required is that he possess a travel document establishing his identity, nationality and ability to enter another country. 8 CFR 212.1(f)(1). Those documents presented to INS upon arrival here are not fraudulent and would permit the TWOV to continue on his journey to the country of his destination if he chose to do so. That person becomes an excludable alien when he constructively abandons those documents and hence his status as a TWOV, when he refuses to continue on his journey and applies for politi-

---

**7.** Prior to 1986, Section 1222 provided that aliens are to be "detained aboard the vessel or at the airport of arrival" or "other place specified by [the Attorney General]," and "at the expense of such vessel or aircraft" pending a determination of whether they are to be excluded based upon any of the diseases or mental or physical defects or disabilities set forth in 8 U.S.C. § 1182(a). Section 1222 now provides that "such aliens shall be detained by the Attorney General, for a sufficient time to enable the immigration officers and medical officers to subject such aliens to observation and an examination sufficient to determine whether or not they belong to the excluded classes." 8 U.S.C. § 1222.

**8.** However, as the discussion regarding the scope of the Transit Agreements makes clear, *see infra,* this proposition is not tenable.

**9.** In Constance O'Keefe, *Immigration Issues and Airlines,* 59 J. of Air L. & Com. 357, 387 n. 79 (1993) (hereinafter *"Immigration Issues "*), the author reports that in the Service's Opposition to Plaintiff's Motion for Summary Judgment in *Air Transport Association of America v. McNary,* Civil Action No. 92–181 (NHJ) (D.D.C.), *see supra* footnote 4, the Service also concedes that asylum-seeking TWOVs are excludable and subject to exclusion proceedings to determine if they are to be excluded.

cal asylum instead.[10] It is at that moment that he becomes an excludable alien for the reason that he has no authorization to remain here. Quite clearly, he is not a stowaway.

It is also significant to note the distinction between the TWOV who becomes an excludable alien and a stowaway. Unlike the term "excludable aliens," the term "excluded" alien, as found in Section 1227(a), is not defined in the INA. Two district courts have concluded that even though "stowaways" are listed in Section 1182 as "excludable aliens," [11] they should be considered "excluded" and hence do not fall under the umbrella of the 1986 User Fee Statute, but rather are covered by Section 1227(a) which mandates carrier responsibility for detention costs. *Dia Navigation Co. v. Reno,* 831 F.Supp. 360, 367 (D.N.J.1993), *rev'd on other grounds sub nom., Dia Navigation Co. v. Pomeroy,* 34 F.3d 1255 (3d Cir.1994); *Argenbright Sec. v. Ceskoslovenske Aeroline,* 849 F.Supp. 276, 280 (S.D.N.Y.1994).

▮ Both courts reached this conclusion based on the fact that stowaways are a particularly disfavored category of aliens and that, unlike other aliens, they are not entitled to an exclusion hearing before an immigration judge to determine whether they "shall be excluded and deported," 8 U.S.C. § 1226(a), and they are not entitled to an appeal to the Attorney General in the event of an adverse determination. *See* 8 U.S.C. § 1323(d).[12] *Argenbright,* 849 F.Supp. at 281 ("In fact, except for temporary medical treatment, alien stowaways are not even permitted to land in the United States.") (citing 8 U.S.C. § 1323(d)). Stowaways who apply for political asylum, however, are accorded asylum hearings and the right of appeal. *Yiu*

*Sing Chun v. Sava,* 708 F.2d 869 (2d Cir. 1983).

In *Sava,* the Second Circuit reconciled Section 1323(d)'s directive denying stowaways a hearing and the right to appeal from an *exclusion order* with Section 1158's directive that the Service establish uniform procedures for *asylum applications* "irrespective of [an] alien's status." In reaching the conclusion that the 1986 User Fee Statute does not mandate Service responsibility for stowaways who seek asylum, the district courts in *Argenbright* and *Dia Navigation* noted that even though asylum-seeking stowaways are granted political asylum hearings and appeals pursuant to *Sava,* this does not change their status as de facto "excluded" aliens. The court in *Argenbright* reasoned:

> The fact that stowaways may now apply for political asylum has not altered their excluded status. *See Yiu Sing Chun v. Sava,* 708 F.2d at 876; *Matter of Waldei,* 19 I & N Dec. 189, 193 (BIA 1984); *cf., United States ex rel. Tom We Shung v. Murff,* 176 F.Supp. 253, 256–58 (S.D.N.Y. 1959).... While section 1158(a) entitles a stowaway to apply for political asylum, the right is limited "solely to the issue of asylum eligibility," thereby preserving the basic thrust of section 1323(d). *Yiu Sing Chun,* 708 F.2d at 876. *Thus, despite the availability of an asylum hearing, stowaways remain "excluded" aliens and, as such, the expenses incident to their detention must be borne by carriers pursuant to section 1227(a)(1). Dia Navigation,* 831 F.Supp. at 371–73.

*Argenbright,* 849 F.Supp. at 281 (footnote omitted) (emphasis added).[13]

▮ In *Dia Navigation Co. v. Pomeroy,* 34 F.3d 1255 (3d Cir.1994), the Third Circuit

---

10. Indeed, if the TWOV decided in mid-air that he wanted political asylum upon arrival, but at the time he purchased his tickets he had no such intent, the TWOV would not be "excludable" because of fraud.

11. 8 U.S.C. § 1182(a)(6)(D) ("Any alien who is a stowaway is excludable.")

12. "The provisions of section 1225 of this title for detention of aliens for examination before special inquiry officers and the right of appeal provided for in section 1226 of this title shall not apply to

aliens who arrive as stowaways[.]" 8 U.S.C. § 1323(d).

13. The impact of *Argenbright* on post-October 27, 1993 stowaways is questionable given the 1993 amendments to the 1986 User Fee Statute. *See* 8 U.S.C. § 1356(h)(2)(A)(v) (Attorney General is responsible for the detention costs of "any alien who is excludable under section 1182(a) of this title who has attempted illegal entry into the United States through avoidance of immigration inspection at air or sea ports-of-entry[.]").

reversed the district court's grant of summary judgment in favor of the government on the ground that the INS unlawfully failed to follow notice and comment rulemaking procedures mandated by the APA before adopting the policy of requiring carriers to bear the financial burden of detaining stowaways pending their political asylum applications. In so doing, the court also acknowledged that "[o]ne consequence of [a stowaway's disfavored status] is that, in contrast to other excludable aliens, stowaways are automatically subject to deportation and have no right to a hearing to determine their *status.*" *Dia Navigation,* 34 F.3d at 1259 (emphasis added). Stowaways who do not seek political asylum, therefore, are subject to immediate deportation. The court noted, however, "a fundamental tension in the statutory framework":

> Sections 1227(a)(1) and 1323(d) require that stowaways be deported immediately unless the Attorney General in the exercise of her discretion determines otherwise, and § 1227(a)(1) places the burden of deportation, and any detention incident to deportation, on the carrier. Section 1105a, however, provides that asylum applicants may not be deported until their applications have been processed, and this is not a matter of discretion. The statute nowhere addresses the question presented here— the status of an asylum applicant, otherwise excluded, pending the processing of the asylum application.

*Id.* at 1262. For purposes of the challenge to the INS policy before this court, the Third Circuit's observations in *Dia Navigation* highlight the fact that, unlike stowaways, TWOVs are *not* an historically disfavored class of aliens and, unlike stowaways, Section 1323(d) does *not* bar them from a hearing before an immigration judge or an appeal to the Attorney General regarding their status as an excludable alien. Whereas stowaways who do not seek political asylum are subject to immediate deportation, the same cannot be said of TWOVs. In other words, the tension noted by the *Dia Navigation* court between "excluded" and "excludable" aliens

as it relates to stowaways is not applicable to TWOVs who do enjoy the right to an *exclusion hearing* and appeal, whereas stowaways do not.[14]

### C. Legislative History of the 1986 User Fee Statute

In support of its interpretation that the 1986 User Fee Statute mandates that INS bear the custodial, physical and financial responsibility of detaining TWOVs pending the determination of their applications for political asylum, Lan–Chile draws the court's attention to several legislative reports. These reports, it argues, establish that it was Congress's intent to "relieve carriers of the obligation to serve as jailers on behalf of INS." Lan–Chile's Memorandum of Law at 11. For example, Lan–Chile draws the court's attention to a 1985 Senate Appropriations Committee Report, in which the Committee stated that it was,

> concerned about the policy of the Immigration and Naturalization Service which requires scheduled passenger airlines to assume custody and financial responsibility for aliens who arrive by plane in the United States *without proper documentation....* The Committee believes this policy raises significant questions about the equity and legal propriety of requiring private entities to assume the financial burdens of maintaining and, at the same time exercising physical custody over, excludable aliens for extended periods of time. Specifically, the Committee is concerned about the possible ramifications of detention of aliens by airline personnel or their agents who are not, of course, law enforcement officials.

S.Rep. No. 99–150, 99th Cong., 1st Sess. 37 (1985) (emphasis added). Identical language appears in the House Appropriations Committee report as well. H.Rep. No. 99–197, 99th Cong., 1st Sess. 38 (1985).

Although the Senate and House Reports specifically discussed aliens who arrive "without proper documentation," the House Appropriations Committee was even more ex-

---

**14.** Of course, as noted above, stowaways are permitted to apply for political asylum and ap-

peal an adverse determination.

pansive in its 1986 report. The Committee wrote,

> Last year the Committee expressed concern about the policy of the INS, which requires scheduled passenger airlines to assume custody and financial responsibility for aliens who arrive by plane in the United States without proper documentation. Specifically, the Committee expressed concerns about the possible ramifications of requiring air carriers, who are not, of course, law enforcement officers, to detain such aliens in hotels and motels. The Committee wishes to reiterate concern over this policy and notes its strong support for a change in policy which would require INS to assume, *in all cases,* all custodial responsibility when the transporting air carriers have demonstrated a good faith effort to detect inadmissibility prior to boarding the aircraft.[15]

H.Rep. No. 99–669, 99th Cong., 2d Sess. 35 (1986) (emphasis added). Other references in the legislative history relate to the committees's concern over aliens who arrive without proper documentation. *E.g.,* S.Rep. No. 99–425, 99th Cong., 2d Sess. 47 (1986) (calling for Congress to "release scheduled passenger airlines and vessels from the responsibility to assume custody or financial responsibility for aliens who arrive by plane or commercial vessel in the United States without proper documentation.").[16]

The legislative reports, therefore, unambiguously demonstrate Congress's intent to shift the financial and physical responsibility of excludable aliens to the Service, even if they do not specifically address the unique situation of TWOVs who seek political asylum, or, for that matter, stowaways who seek political asylum. The Third Circuit is in agreement. *Dia Navigation,* 34 F.3d at 1262 ("[T]he backdrop for the present statutory scheme is the repeal of § 1223, which clearly did place the burden of paying for detention on carriers, and a legislative history strongly evincing congressional desire to place responsibility for detention on INS.").

The Service also argues, correctly, that reference to legislative history alone is not appropriate in this case because neither the language of the Act nor its legislative history demonstrate Congress's intent to change the long-standing policy of allowing INS to enter into transit agreements with carriers regarding TWOVs. While it is also true that none of the reports cited by plaintiff use the words "transit without visa aliens" or explicitly state the applicability of the statute to TWOVs per se, the intent of Congress as it

---

**15.** The policy change advocated in this report is already reflected in 8 U.S.C. § 1227(a) in which the carrier is relieved of the responsibility of detention maintenance expense where the carrier establishes that the ground of exclusion addressed in that section could not have been ascertained by the exercise of due diligence prior to the alien's embarkation.

**16.** In the district court in *Dia Navigation,* the plaintiff had also argued that the 1986 User Fee Statute mandated that INS bear the responsibility for detaining stowaways after they had requested political asylum and it too cited the legislative reports in support of this reading of the statute. The court's conclusion, however, was as follows:

> [E]ven if the legislative history cited by [plaintiff] is considered, that history does not unambiguously support [plaintiff's] position. The legislative reports cited by [plaintiff] express only a generalized concern over INS policy as it existed prior to enactment of the User Fee Statute. *The reports do not interpret the User Fee Statute as passed or discuss its applicability to specific situations, such as stowaways.* Moreover, the legislative reports

explicitly refer only to aliens arriving "without proper documentation." *See supra* at p. 369. As the Government points out, aliens without proper documentation constitute a specific category of excludable aliens, separate and distinct from stowaways....

> Accordingly, while Congress may have been generally concerned about requiring carriers to assume responsibility for the detention of all excludable aliens, or, specifically, for the detention expenses of aliens without proper documentation, nothing in the legislative history unambiguously suggests that Congress intended to alter the long-standing treatment of the stowaways under the INA.

*Dia Navigation,* 831 F.Supp at 371 (citations omitted) (emphasis added), *rev'd on other grounds sub nom., Dia Navigation Co. v. Pomeroy,* 34 F.3d 1255 (3d Cir.1994). Two observations are in order: First, as noted above, at least one legislative report did not concern itself with the *specific* class of aliens who arrive without proper documentation, but rather spoke of "all cases" and second, these reports unambiguously demonstrate Congress's intent to shift the responsibility of jailing detained aliens from the carriers to the federal government.

relates to the detention of excludable aliens in general is clearly articulated.

### D. *Regulations After the 1986 User Fee Statute*

In ordering Lan–Chile to provide for the detention of the excludable aliens in this case, the Service relied in part on certain regulations issued following the enactment of the 1986 User Fee Statute. Section 235.3(d) of Title 8 of the Code of Federal Regulations, for example, provides as follows:

> (d) *Service custody.* The Service will assume custody of any alien subject to detention under § 235.3(b) or (c) of this section, *except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger.*

8 C.F.R. § 235.3(d) (1994) (emphasis added). Aliens who are subject to detention under Section 235.3(b) and (c) include aliens with no documentation or false documentation, or aliens who have documentation but "appear[ ] to the inspecting officer to be inadmissible[.]" 8 C.F.R. § 235.3(c) (1994). In 8 C.F.R. 238.3(c) (1994), INS states that,

> (c) Carrier responsibility. Nothing contained within the provisions of section 286 of the Act [8 U.S.C. § 1356] [the 1986 User Fee Statute] shall be deemed to waive the carrier's liability for detention, transportation, and other expenses incurred in the bringing of aliens to the United States under the terms of this section.

"This section" (238.3(a)) refers to "[a] transportation line bringing aliens to the United States pursuant to § 212.1(f)(1)," which establishes the procedures for the TWOV program. Section 212.1(f)(1), in turn, provides that

> "A passport and visa are not required of an alien who is being transported in *immediate and continuous transit through the United States* in accordance with the terms of an agreement entered into between the transportation line and the Service under the provisions of section 238(d) of the Act [8 U.S.C. § 1228(c) ] on form I–426 to insure such *immediate and continuous transit through, and departure from, the United States en route* to a specifically designated foreign country: *Provided,* That

such alien is in possession of a travel document or documents establishing his/her identity and nationality and ability to enter some country other than the United States."

8 C.F.R. § 212.1(f)(1) (1994) (emphasis in original).

The scope of these regulations could not be clearer: Read and construed in their entirety, the regulations and the statutes form a mosaic which compels the conclusion that the transportation line was intended to be responsible for the custody of a TWOV only so long as necessary "to insure such immediate and continuous transit through, and departure from, the United States en route to a specifically designated foreign country." The irresistibility of that conclusion is buttressed by 8 C.F.R. § 214.2(c)(1) (1994) which, in relevant part provides:

> The privilege of transit without a visa may be authorized only under the condition[ ] that ... *the alien will not apply for extension of temporary stay ...*

Upon the application by the alien for political asylum, which triggers an extension of his stay, the condition upon which the privilege of transit without a visa was granted is breached. At that moment, his status as a TWOV is forfeited and he becomes an excludable alien, having no other rightful authorization to remain in the country. If, therefore, the privilege granted to transportation lines is on condition that the alien will continue in transit and not apply for extension of temporary stay and the carrier accepts the privilege upon that condition, imposing custodial responsibility upon the carrier when the *alien* breaches the condition is hardly defensible.

In 1989 the INS promulgated 54 Fed.Reg. 100–02 (Jan. 4, 1989), which stated that,

> Certain commentators requested clarification regarding carrier/Service responsibility for detained aliens in immediate and continuous transit (TWOV passengers). Although the issue of carrier responsibility may be a thorny one, the rules and regulations are very clear. Pub.L. 99–591 did not repeal section 238 of the Act; thus, contracts entered into pursuant to section

238, and in this particular instance we are concerned with carrier financial responsibility for detained TWOV passengers, are valid and enforceable. *In sum, carriers are responsible for the detention expenses of detained TWOV passengers while in Service custody as well as having financial responsibility for return transportation to TWOV passengers point to embarkation following a deportation/exclusion order.*

*Id.* at 101 (emphasis added). This statement by the Service neatly summarizes its position in this litigation; namely, that irrespective of the passage of the 1986 User Fee Statute, carriers remain responsible for the detention of asylum-seeking TWOVs because of the contracts they have entered into pursuant to 8 U.S.C. § 1228.

### E. *Pub.L. No. 103–121*

On October 27, 1993, Congress passed the Departments of ·Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation Act, Pub.L. No. 103–121, 107 Stat. 1153–97, which amended the 1986 User Fee Statute. The Act now reads as follows:

The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General in providing immigration inspection and preinspection services for commercial aircraft or vessels and in: ...

(v) providing detention and deportation services for: excludable aliens arriving on commercial aircraft and vessels; *and any alien who is excludable under section 1182(a) of this title who has attempted illegal entry into the United States through avoidance of immigration inspection at air or sea ports-of-entry.*

(vi) providing exclusion and asylum proceedings at air or sea ports-of-entry for: *excludable aliens arriving on commercial aircraft and vessels including immigra-*

*tion exclusion proceedings resulting from presentation of fraudulent documents and failure to present documentation;* and any alien who is excludable under section 1182(a) of this title who has attempted illegal entry into the United States through avoidance of immigration inspection at air or sea ports-of-entry.

8 U.S.C. § 1356(h)(2)(A)(v) and (vi) (Oct. 27, 1993) (emphasis added).[17] The import of this amendment is clear: If there was any doubt before October 27, 1993, as to the scope of the 1986 User Fee Statute vis-a-vis stowaways the doubt can now be put to rest. The Act now makes explicit that the Attorney General is to be reimbursed for monies which she expends in providing detention services for excludable aliens who are excludable pursuant to Section 1182 because of their attempted illegal entry through avoidance of immigration inspection. It logically follows that if the Attorney General is to be reimbursed for providing these services, she must first incur the expenses incident to the detention services. The Act also makes clear that the Attorney General must be reimbursed for fees expended in providing detention and deportation services for excludable aliens and for exclusion and asylum proceedings at air or sea ports-of-entry for aliens.[18]

### III. *The Administrative Procedures Act*

Count I of the complaint alleges that the INS policy of requiring Lan–Chile to shoulder the physical and financial responsibility of detaining TWOVs pending the determination of their political asylum applications is ·"in excess of statutory authority and otherwise not in accordance with law, in violation of the [APA]." Complaint, ¶ 35. In Count II, Lan–Chile alleges that this INS policy is "arbitrary and capricious and therefore violates the [APA]." Complaint, ¶ 40.

### A. *Count I*

Section 706 of Title 5 of the United States Code provides in relevant part that a court

---

17. Lan–Chile's motion for summary judgment was filed on or about September 8, 1993, and oral argument was held on November 12, 1993. Since that date neither plaintiff nor the Service brought the amendment of the 1986 User Fee Statute to the attention of the court.

18. The 1986 Act was also amended to increase the fee charged for each individual from five dollars to six dollars. 8 U.S.C. § 1356(d).

reviewing agency action shall "compel agency action unlawfully withheld or unreasonably delayed" and shall hold unlawful and set aside any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise *not in accordance with law* [.]" 5 U.S.C. § 706(1), (2) (emphasis added).

■ The Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984), outlined the proper method of reviewing an agency's interpretation of a statute which it administers. "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. at 2781. If the statute does not clearly and unambiguously reflect the intent of Congress, the court cannot substitute its own construction of the statute; "[r]ather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. The agency's legislative regulations are "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 844, 104 S.Ct. at 2782. The agency's interpretation of the statute need only be reasonable: "[A] court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* Furthermore, an agency's construction of a statutory scheme is to be accorded "considerable weight." *Id.* The Court stated that the principle of deference to administrative interpretations,

> has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations....

> If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we would not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

*Id.* at 844–45, 104 S.Ct. at 2782–83 (citations omitted).

Applying these "well-settled principles," *id.* at 845, 104 S.Ct. at 2783, to this case, it is first to be noted that Congress has not "directly spoken to the precise question at issue." The 1986 User Fee Statute does not unambiguously states that INS is responsible for detaining TWOVs who request political asylum; rather, it states that the Attorney General shall be reimbursed for funds expended in, among other things, detaining "excludable aliens." Likewise, the legislative history of Pub.L. No. 99–591 does not indicate a clear intent by Congress regarding the *specific* case of the cost of detaining asylum seeking TWOVs pending the determination of their applications for political asylum, although it clearly establishes the general intent of Congress to shift the responsibility for detaining excludable aliens from the private carriers to the federal government.

Turning then to the agency's interpretation of the 1986 User Fee Statute and the regulations promulgated thereunder, the question is whether this interpretation is reasonable and whether it is based on a permissible construction of the statute. In this case, the court is called upon to review the action of an administrative agency which requires common carriers to bear the physical and financial responsibility of detaining TWOVs who have applied for political asylum regardless of the passage of the 1986 User Fee Statute. In reaching its determination that such action is proper, the Service is interpreting the Act itself, the regulation which allegedly exempts TWOVs from the purview of the Act (8 C.F.R. § 235.3(d) (1994)), and the Transit Agreement which is authorized by the INA.

In *Osorio v. Immigration and Naturalization Service,* 18 F.3d 1017 (2d Cir.1994), the Second Circuit was recently asked to review agency action which also turned on the interpretation of the INA and its related regula-

tions. In *Osorio,* the Board of Immigration Appeals (the "BIA") affirmed an Immigration Judge's decision denying an application for political asylum by a former union activist in Guatemala. In so doing, the BIA interpreted the phrase "political opinion" as found in 8 U.S.C. § 1101(a)(42)(A) and 8 C.F.R. § 208.13(b) (1994) to mean that persons who are persecuted on account of their membership in or leadership of a union and the activities that flow therefrom are not eligible for asylum on any basis.[19] The Second Circuit reversed the BIA's determination because "[t]his interpretation of the Act contradicts the plain meaning of the Act." *Id.* at 1031. The court explained:

> In reviewing a decision of the BIA, we are mindful of the substantial deference we owe such administrative tribunals in their interpretations of statutory law. Nevertheless, *we will reverse an unreasonable interpretation of the BIA.* . . . Specifically, we will reverse the BIA's interpretation of statutory law where " 'it appears from the statute or its legislative history' " that the interpretation is contrary to Congress's intent.

*Id.* at 1022 (emphasis added). *See also Lok v. Immigration and Naturalization Service,* 548 F.2d 37, 39–41 (2d Cir.1977) (Court of Appeals holds that BIA's interpretation of the INA is not reasonable because the plain language of the act and the legislative history indicate that the agency's position frustrates Congressional intent).

Given the well-settled maxim that agency action and agency interpretation of statutes and regulations are only owed substantial deference if they are "reasonable," we now turn to the Service's interpretation of the 1986 User Fee Statute, the regulations promulgated thereunder, and the Transit Agreement to determine if the agency has violated the APA.

1. *The Reach of the 1986 User Fee Statute and the Regulations Promulgated Thereunder*

It is conceded that the repeal of 8 U.S.C. § 1223 and the passage of the 1986 User Fee Statute shifted the burden of detaining "excludable aliens" from the carriers to the INS. 53 Fed.Reg. 1791 (Jan. 22, 1988) ("Subsection 206 of Pub.L. 99–591 places the responsibility for physical custody of excludable aliens pursuant to former section 233 of the Immigration and Nationality Act of 1952, as amended . . . on the INS."). INS also concedes that aliens who defraud the government by accessing the TWOV program when they are, in fact, planning to seek political asylum, are "excludable aliens" pursuant to 8 U.S.C. § 1182(a)(6)(C)(i). Furthermore, it is undisputed that TWOVs who arrive pursuant to the contract signed by the Service are not immediately "excluded" as are stowaways who do not request political asylum; they are in the country pursuant to a legitimate program endorsed by the government but are "excludable" because by seeking asylum they have abandoned their status as TWOVs and have no authorization to remain.

The plain meaning of the Act, therefore, coupled with the definition of "excludable aliens" found in the INA and the "excludable" status of the aliens, (*i.e.,* they have no visa), together with the legislative backdrop to the repeal of Section 1223 and the legislative reports relating thereto, compel the conclusion that the Attorney General must be reimbursed for "expenses incurred . . . in . . . providing detention and deportation services for [TWOVs who request political asylum] arriving on commercial aircraft and vessels[.]" 8 U.S.C. § 1356(h)(2)(A)(v).

■ Given the fact that the Act was designed to relieve carriers of the physical and financial responsibility of detaining aliens, *see* discussion of legislative history *supra,* it follows that an INS policy (or an INS interpretation of the Act or its regulations) which results in imposing upon the *carriers* custodial responsibility for these excludable aliens is in clear contravention of the plain meaning of the Act and is in violation of Congressional intent, and hence is unreasonable and in

---

**19.** The INA provides in relevant part that "[t]he term 'refugee' means (A) any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to . . . that country because of persecution . . . on account of . . . political opinion. . . ." 8 U.S.C. § 1101(a)(42)(A).

violation of the APA. *Osorio,* 18 F.3d at 1031.

■ Furthermore, it is also inequitable to hold the carriers physically and financially responsible for detaining these particular aliens because (i) it would have been impossible to screen the aliens before boarding to determine which aliens planned on seeking asylum; (ii) there are no guidelines for how long a carrier must detain the alien before his or her application is processed; and (iii) it is inconsistent with the statutory and regulatory basis which merely contemplates allowing TWOVs to transit through the country.

#### a. *A Question of Equity*

In *Aerolineas Argentinas v. United States,* 31 Fed.Cl. 25 (1994), the court rejected in dicta the argument that it is inequitable to hold the airlines responsible for a situation which they cannot avoid; *i.e.,* preventing the boarding of TWOVs who intend to seek political asylum once they arrive in the United States.[20] *Id.* at 32 n. 9. The court wrote: "[T]he INS provided guidance that dealt with such problems, by presuming proper boarding and no stowaway status if there is 'reasonable diligence' by the carrier at the port of embarkation, which the carrier may show by 'photocopying the documents and tickets of persons who are profiled as possible violators.'" *Id.* (quoting INS Operations Cable:

Stowaways on Commercial Airline Flights, at 10 (Dec. 19, 1989)). It is difficult to understand how the airlines are in a position to effectively screen passengers with an eye toward ferreting out those properly documented TWOVs who, upon arriving in the United States, will discontinue their journey and make application for political asylum. "Reasonable diligence" in the form of checking and photocopying documents does not provide the carrier with the ability to read the minds of these passengers to insure that those who plan to seek asylum will not be allowed to board.[21]

#### b. *The Lack of Guidelines*

The unreasonableness of the Service's interpretation of the 1986 User Fee Statute and its regulations is forcefully highlighted by the fact that if the agency's interpretations are accepted, the private carriers are obliged to maintain custody of asylum seeking TWOVs *indefinitely* and with absolutely no guidelines as to the custodial conditions they must provide for their detainees, irrespective of the passage of the 1986 Act. In this regard, the district court in *Dia Navigation* reported on the unreasonableness of the agency's position in a colloquy which is worth reporting at length:

> At oral argument, the Government attorney, Alexander Shapiro, Esq. ("Shapiro") took the implausible position that, *whatev-*

20. In that case the court determined that the United States Court of Federal Claims lacks jurisdiction to entertain an action brought by the airlines to recover the cost of detaining TWOVs as they awaited the processing of their applications for political asylum. In so holding, the court reasoned that the plaintiffs had no claim against the United States "founded ... upon ... any Act of Congress," 28 U.S.C. § 1491(a)(1) (the Tucker Act), because (i) the 1986 User Fee Statute does not require that money spent by the airlines in detaining TWOVs who request asylum must be paid over to the government directly or in effect; and (ii) the Act does not mandate payment by the government to the airlines to cover these costs. *Id.* at 29–31. The court's analysis, however, does not impact on the question of whether TWOVs who request asylum are "excludable aliens" as that phrase is used in the 1986 User Fee Statute, or whether the agency's decision to hold the carriers responsible for detaining TWOVs who request asylum—irrespective of the passage of the 1986 Act and its legislative history—is in violation of the APA.

21. One of the difficulties in resolving the reach of the 1986 statute is that it is not clear from the government's papers which excludable aliens it is responsible for detaining. INS contends that before passage of the 1986 User Fee Statute it could have ordered any inadmissible alien who attempted to enter the country into the custody of the carrier. "INS regulations also reflected the pre–1986 policy under which carriers bore the detention costs of all aliens arriving without travel documents, with false documents, or who were otherwise inadmissible." INS's Memorandum of Law at 17. However, "[t]he amendment of 8 U.S.C. § 1222, alongside the creation of the User Fee Account, reversed the policy of holding carriers liable for the detention of this broader class of excludable aliens." *Id.* The Government does not state, however, which excludable aliens from this "broader class" are not to be detained by the INS other than TWOVs seeking asylum. It is reasonable to wonder which "excludable aliens" fall under the umbrella of Section 1356(d) if, in fact, the phrase does not include asylum-seeking TWOVs.

er the conditions or duration of detention imposed by the INA, a carrier cannot challenge those conditions as unreasonable.... For instance, the 23 July 1993 Tr. reads, in part:

COURT: Suppose the[e asylum] [sic] hearing doesn't occur for two years. By definition, that's reasonable?

SHAPIRO: Yes, your Honor....

COURT: Ten years, would that be reasonable?

SHAPIRO: If necessary to hold the alien that long, yes....

COURT: Suppose the hearing just didn't occur for 60 days, but could have occurred within 10 days, are those additional 50 days unreasonable?

SHAPIRO: No....

COURT: I'm asking you whether [carriers] have the right to challenge what the INS does. You say no. The INS can do literally anything, take as much time as it wants, impose as many conditions as it wants and then the INS can say, this is reasonable and they're at a dead end. Is that what you're saying?

SHAPIRO: Essentially, yes, your Honor....

COURT: That just doesn't sound fair. You can have [an INS inspector] who has a bad day and says, I want two guards on this guy 24 hours a day, I want him put in the Plaza, I want him given gourmet meals and you're telling me that that vessel owner can't say a thing about that, right?

SHAPIRO: Yes.

*Dia Navigation*, 831 F.Supp. at 377 n. 36 (emphasis in original), *rev'd on other grounds sub nom., Dia Navigation Co. v. Pomeroy,*

34 F.3d 1255 (3d Cir.1994).[22] This exchange between the Service and the court highlights the fact that the agency's interpretation of the 1986 User Fee Statute and its regulations is seriously flawed because, *notwithstanding the passage of the 1986 Act,* the agency continues to believe that the Service can hold private carriers responsible for jailing these aliens indefinitely and pursuant to any conditions the agency deems appropriate.[23] The mere statement of that position bespeaks its unsoundness.[24] Furthermore, although the legislative history of the 1986 User Fee Statute did not specifically discuss the issue of TWOVs who request political asylum, it does establish that Congress was concerned about compelling corporations to become private jailers. The possible negative ramifications of turning private corporations into jailers is obvious and it was a concern noted by the House Appropriations Committee one year prior to the passage of the 1986 User Fee Statute. H.R.Rep. No. 197, 99th Cong., 1st Sess. 38 (1985) ("Specifically, the Committee is concerned about the possible ramifications of detention of aliens by airline personnel or their agents who are not, of course, law enforcement officials.").

■ INS, on the other hand, argues that its construction of the 1986 User Fee Statute is reasonable because (i) the Act only requires reimbursement of expenses incurred by the Attorney General and does not mandate payment to private carriers; (ii) Section 1228(c) still allows the INS to enter into contracts to guarantee the passage of TWOVs through the United States; and (iii) the Act only intended to free carriers in certain cases from liability for detention costs for certain excludable aliens, not all excluda-

---

**22.** On appeal the Third Circuit also noted that "our attention has been directed to no set standards, in the form of regulations or otherwise, concerning the conditions under which such aliens [stowaways] are detained." *Dia Navigation*, 34 F.3d at 1257.

**23.** In one case which received national attention, more than 18 stowaways from Romania, who arrived in Boston by hiding in metal cargo containers loaded onto a freighter in France, were held for several weeks by the private carrier in Newark, New Jersey, shackled together by leg irons. Joseph F. Sullivan, *In Shift, Immigration*

*Service Won't Hold Stowaways,* N.Y. Times, August 5, 1994, at B5.

**24.** The court wishes to make clear that it is *not* basing its determination that the agency's actions in this case are violative of the APA simply because there are certain inequities which result from the agency's actions. Reference to the extremes of the agency's position merely highlights the extent to which its interpretations of the 1986 Act, its regulations, and the Transit Agreement, are unreasonable and hence not worthy of the traditional deference usually accorded agency interpretation.

ble aliens. INS's Memorandum of Law at 13–18. These arguments need not detain us long. First, for purposes of determining whether the agency action in this case is reasonable, the fact that the Attorney General is the party authorized to receive reimbursements from the Immigration User Fee Account weighs in *favor* of the carriers because it indicates, as does the legislative history, that the *Government* should be bearing the responsibility of detaining these excludable aliens. Second, as discussed below, the Transit Agreements which the carriers and the Service entered into in the 1950s—and which survived both the 1986 Act and the 1993 amendments—do *not* mandate that the carriers bear the physical and financial responsibility for indefinite detention of TWOVs who are no longer aliens in transit. Finally, the Service's reference to the intent of the 1986 Act is belied by its legislative history and the plain meaning of the statute itself: Section 1356 of Title 8 of the United States Code provides that the Attorney General must be reimbursed for "expenses incurred ... in ... providing detention and deportation services for *excludable aliens* arriving on commercial aircraft and vessels[.]" 8 U.S.C. § 1356(h)(2)(A)(v) (emphasis added). The 1986 Act does not limit itself to "certain" excludable aliens; it provides that the government must take responsibility for the detention of "excludable aliens." [25] The Service's approach in interpreting the 1986 User Fee Statute has been to start with the conclusion that the term "excludable aliens" does not include the aliens at issue in this challenge and then work backwards. This is reminiscent of Justice Frankfurter's observation that, "[i]n matters of statutory construction ... it makes a great deal of difference whether you start with an answer or with a problem." Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527, 529 (1947).

▇▇▇ The INS also argues that it is reasonable for the Service to interpret the 1986 User Fee Statute as still requiring carrier responsibility for asylum-seeking TWOVs because, as the district court in *Dia Navigation* and *Argenbright* concluded, those sections of the INA which survived passage of the Act and which mandate carrier responsibility for the detention of "excluded" aliens would be rendered superfluous if, in fact, the 1986 User Fee Statute is read as relieving carriers of responsibility in this situation. However, because *Dia Navigation* and *Argenbright* dealt with a specific and distinct category of excludable aliens (*i.e.,* stowaways) for which there is a statutory provision clearly establishing carrier responsibility for detention (Section 1323(d)), these cases are inapposite. Whereas Section 1323(d) allegedly requires carriers to detain stowaways irrespective of the 1986 User Fee Statute, Section 1228(c) *only* provides that INS may enter into contracts with the carriers to guarantee passage *through* the United States; unlike Section 1323(d), Section 1228(c) does not unambiguously state that carriers are responsible for the detention of the aliens in question. Therefore, Section 1228 is not rendered superfluous by the fact that this court has determined that the 1986 User Fee Statute requires that INS bear the physical and financial responsibility of detaining TWOVs who have discontinued their journey and are therefore no longer aliens in transit while their applications for political asylum are being processed. To the extent that the Transit Agreements require the private carriers to detain TWOVs *qua* TWOVs during their lay-over in the United States prior to their departure for the final leg of their journey, they retain their validity.

### c. *The Statutory and Regulatory Basis of the TWOV Program*

▇▇▇ The very statutory and regulatory provisions which provide for the transiting of aliens through the United States also demonstrates that the INS policy in this action exceeds its statutory authority and is in vio-

---

**25.** Because the court has determined that the agency action in this case is not reasonable, it need not reach the other bases upon which Lan-Chile argues that deference to agency interpretation is not owed; namely, that (i) INS has adopted a inconsistent position regarding the INA and the 1986 User Fee Statute because the agency began relying on Section 1228(c) as a basis for carrier custody only after Congress repealed Section 1223; and (ii) INS has a financial interest in how the applicable statutes are interpreted. Lan-Chile's Reply Memorandum at 3–5.

lation of the APA. As noted above, Section 214.2(c)(1) of Title 8 of the Code of Federal Regulations specifically provides that the privilege of allowing the carriers to transit passengers through the United States is authorized on the condition that "the alien will not apply for extension of temporary stay or for adjustment of status under section 245 of the Act." This regulatory provision, in the court's view, is very significant, if not dispositive. It indicates the Service's position that the TWOV program is not applicable if the alien applies for an adjustment of status or for an extension of his right to remain temporarily in the country. TWOVs who seek political asylum are seeking an extension of their right to stay temporarily in the country and, therefore, the carrier's responsibilities *vis-a-vis the Transit Agreement* must necessarily come to an end. Furthermore, as noted earlier, the statutory provision which provides for the Transit Agreement, 8 U.S.C. § 1228(c), only speaks of guaranteeing passage of these aliens "through" the United States; once a TWOV requests political asylum he is no longer an alien transiting *through* the United States.

### (1) *Custody v. Cost*

In a letter to the court dated August 5, 1994, the Service argues that the Third Circuit's decision in *Dia Navigation* supports its interpretation of the 1986 User Fee Statute because the court acknowledged that 8 C.F.R. § 253.1(f)(3) (1994) allows the Service to parole stowaways into the custody of the private carriers irrespective of the passage of the 1986 User Fee Statute. This regulation, which was promulgated pursuant to the notice and comment provisions of the APA, provides in relevant part as follows:

(f) Any alien crewman, stowaway, or alien temporarily excluded under section 235(c) of the Act [8 U.S.C. § 1225(c)] who alleges that he cannot return to his country of nationality or last habitual residence ... because of fear of persecution ... is eligible to apply for asylum or withholding of deportation under part 208 of this chapter....

(3) Pending adjudication of the application by the Asylum Officer, the applicant may be detained by the Service, *or paroled into the custody of the ship's agent* or otherwise paroled in accordance with § 212.5 of this chapter and shall not be excluded or deported before a decision is rendered by the Asylum Officer on his asylum application.

8 C.F.R. § 253.1(f)(3) (1994) (emphasis added). This regulation allows the Service to parole into the custody of a private carrier three types of excludable aliens: (i) alien crewmen; (ii) stowaways; and (iii) aliens temporarily excluded pursuant to 8 U.S.C. § 1225(c). Section 1225(c), in turn, provides in relevant part that "[a]ny alien ... who may appear to the examining immigration officer ... to be excludable under subparagraph (A) (other than clause (ii)), (B), or (C) of section 1182(a)(3) of this title shall be temporarily excluded...." Sections 1182(a)(3)(A)(i) and (iii) provide, in turn, that aliens who seek to enter to engage in espionage or sabotage or violate laws prohibiting export of designated goods or information or to engage in activity designed to overthrow the Government of the United States by force are excludable. Therefore, 8 C.F.R. § 253.1(f)(3) (1994), only gives the Service the option of paroling stowaways, alien crewmen and security-risk aliens into the custody of the private carrier pending the adjudication of their asylum applications, regardless of the passage of the 1986 User Fee Statute. The Service does not contend that the asylum-seeking aliens in this action are security-risk aliens pursuant to 8 U.S.C. § 1182(a)(3), and hence 8 C.F.R. § 253.1(f)(3) (1994) is irrelevant for purposes of this motion.

■ As the Service correctly notes, however, the court in *Dia Navigation* recognized the difference between the *custody* of asylum-seeking stowaways (and pursuant to Section 253.1(f)(3) the Service may still parole these aliens into carrier custody) and the *cost* of detaining these asylum-seeking aliens (which, the court reasoned, can only be borne by the carriers if the Service adopts its policy pursuant to the notice and comment requirements of the APA). The Service therefore argues that, at the very least, this court cannot reach the determination that the Service is responsible for both the custody *and* the cost of detaining asylum-seeking aliens

because the court in *Dia Navigation* held that the Service's interpretation of Section 253.1(f)(3) was reasonable. There are at least three responses to this contention. First, Section 253.1(f)(3) does not deal with TWOVs, who, after arrival in the United States seek asylum; it is concerned with alien crewmen, stowaways, and security-risk aliens. Therefore, it is not surprising that the Third Circuit, when faced with a regulation which *specifically* empowers the Service to parole into carrier custody certain aliens (such as stowaways), should conclude that the regulation is valid irrespective of the passage of the 1986 User Fee Statute.[26] Second, there is no regulation equivalent to Section 253.1(f)(3) which survived the passage of the 1986 User Fee Statute and which empowers the Service to parole TWOVs who seek asylum into the custody of a carrier. In contrast, the section of the INA which *did* survive the passage of the 1986 Act that relates to TWOVs (Section 1228) and the regulations promulgated in conjunction therewith (*e.g.,* 8 C.F.R. § 238.3(c) (1994)) only deal with carrier responsibility *as it relates to the transiting of aliens through the United States.* These regulations, and the Transit Agreement, do *not* empower the Service to parole into the custody of the private carriers TWOVs who abandon their status as such by seeking asylum. Given the mandate of the 1986 User Fee Statute, a regulation which sought to accomplish that directive would be in conflict with the Act and its legislative history. Finally, the legislative history of the Act makes clear that it was Congress's concern about transforming private transportation companies into jailers which prompted, in part, the enactment of the 1986 User Fee Statute. If, as is the case, Congress did not want carriers such as Lan–Chile acting as jailers for excludable aliens, then it follows that Congress's directive that the Attorney General be reimbursed for the

cost of detaining these aliens means that the *Service* must accept the responsibility of physically detaining these persons. It is illogical to suggest that Congress had a particular evil in mind (*i.e.,* transforming corporations into jailers) and then passed a statute the effect of which allows the evil to continue (*i.e.,* allowing the Service to parole aliens into the custody of the carriers and reimbursing them at a later date). It is not surprising, therefore, that the 1986 User Fee Statute provides that the Attorney General shall be reimbursed for providing "detention . . . services" for "excludable aliens." The analysis of the Third Circuit, therefore, does not alter this court's conclusion that the passage of the 1986 User Fee Statute directs the Service to assume both the custody and the cost of detaining asylum-seeking TWOVs pending the determination of their political asylum applications.

### 2. *The Scope of the Transit Agreement*

The adoption of The Department of Justice Appropriation Act, Pub.L. No. 99–591, and the 1986 User Fee Statute did not result in the repeal of Section 238(c) of the INA, 8 U.S.C. § 1228(c).[27] This section provides in relevant part that

> The Attorney General shall have power to enter into contracts including bonding agreements with transportation lines to guarantee the passage through the United States in *immediate and continuous transit of aliens destined to foreign countries.*

8 U.S.C. § 1228(c) (emphasis added).

▆▆ As noted above, Lan–Chile and INS entered into a Transit Agreement as authorized by the INA. The Transit Agreement is a contract in which INS agrees to waive the requirement that TWOVs possess certain documentation in order to enter the country in return for certain promises by the carrier.

---

**26.** However, if the analysis of the Third Circuit is accepted, then the 1993 amendments to the 1986 User Fee Statute only compel the Service to provide for the cost of detaining asylum-seeking stowaways, and not for their physical custody, even though Section 1356(h)(2)(A)(v) now provides that the Attorney General shall be reimbursed for the "detention . . . services" provided for "any alien who is excludable under section

1182(a) of this title who has attempted illegal entry into the United States through avoidance of immigration inspection at air or sea ports-of-entry."

**27.** Section 1228(c) and the regulations regarding Transit Agreements also survived passage of the 1993 amendments to the 1986 User Fee Statute.

Paragraph 4 of the Transit Agreement provides that INS and the carrier agree,

> That all alien passengers brought to the United States under the terms of this agreement shall be detained in quarters provided or arranged for by the line, in the custody of immigration officers of the United States or such other custody as the Commissioner may approve: Provided, That the line shall reimburse the United States for salaries and expenses of immigration officers of the United States during such times as they are actually employed in maintaining custody of such alien *passengers*. The line shall maintain supervision of all such *passengers* at all times while they are in the United States and not in the actual custody of immigration officers or other custody approved by the Commissioner.

Transit Agreement, ¶ 4 (Plaintiff's Motion for Summary Judgment, Ex. D) (emphasis added). The Transit Agreement also provides that the carrier must bear the expense of transporting the alien to a foreign port whenever such alien is found not to be eligible for passage through the United States in immediate and continuous transit. *Id.*, ¶ 5. In addition, carriers must pay $500 for every failure to transport any TWOV in immediate and continuous transit within the time set by the appropriate immigration officer for his or her departure. *Id.*, ¶ 7.

Lan–Chile asserts that the language of Paragraph 4 of the Transit Agreement only requires carriers to carry the burden of detention during the course of the alien's "immediate and continuous" transit through the United States to a foreign country. The agreement, it argues, was designed in the 1950s to impose on the carrier the responsibility of detaining the alien during his or her 8–hour lay over and no more. "This short duration supervision of *transiting* TWOV aliens ... is all that Paragraph 4 of the Agreement addresses." *Id.* at 16 (emphasis in original). Lan–Chile also argues that the Transit Agreement already includes a provisions for those TWOVs who are found ineligible to transit through the United States; namely, immediate return to the foreign port from which the alien embarked, with the

costs borne by the carrier (¶ 5), and payment of $500 for every failure to transport the alien in immediate and continuous transit (¶ 7).

In response, INS contends that a "plain reading" of the agreement indicates that it applies to TWOVs who request political asylum because Paragraph 4 specifically states that the agreement applies to "all alien passengers brought to the United States under this agreement" and the aliens brought into the United States were brought to the country "under this agreement" (they were allowed entry because they are TWOVs). The INS also rejects Lan–Chile's suggestion that it could not have been contemplated in the 1950s that carriers would be responsible for the cost of detaining TWOVs who requested political asylum because INS regulations, it argues, have always put carriers on notice that they were responsible for all costs associated with TWOVs. *See, e.g.,* 8 C.F.R. § 214.2(c)(1) (1994), discussed *supra*. Finally, INS argues that the liquidated damages provision of the contract (¶ 7) is not dispositive of the issue of costs incurred in detaining TWOVs; if it were, "the Government would be responsible for all such costs once an effective 'deductible' of $500 was satisfied," INS's Memorandum of Law at 20, and this reading would, among other things, render void the language in the contract which requires the carrier to bear the cost of returning the alien to his or her point of origin.

Lan–Chile's reading of the Transit Agreement and its related regulations is, in this court's opinion, the correct interpretation. These documents indicate beyond cavil that they were designed to ensure that the carriers would be responsible for detaining TWOV aliens while they remained in the country and before they embarked on the next leg of their journey out of the country which is usually a short period of approximately eight hours. The statute which authorizes the contracts states that the goal of the contracts is to "guarantee" passage "through" the United States. 8 U.S.C. § 1228(c). It defies credulity to interpret this document as standing for the proposition that there was a meeting of the minds between the carriers and the government in

which the carriers agreed that should the TWOVs decide to abandon or surrender their travel documents and seek asylum, the carriers would take responsibility for their *indefinite* medical, detention, and other needs pending disposition of their political asylum applications. The contract specifically states that the carriers are responsible for "passengers" while they are in the United States. As one commentator has correctly noted, "[s]urely, aliens waiting months for asylum hearings are no longer 'passengers.'" *Immigration Issues*, 59 J. of Air L. & Com. at 390.[28] It can also be added that individuals who are awaiting a determination of the political asylum applications are no longer "transiting" through the United States. It belabors the obvious to reiterate that this contract only places upon the carriers the responsibility of detaining TWOVs while they await the next flight in their trip "through" the United States.[29]

■ It will be recalled that the Transit Agreement states that "[t]he line shall maintain supervision of all such *passengers* at all times while they are in the United States and not in the actual custody of immigration officers or other custody approved by the Commissioner." (emphasis added). It is a familiar principle of construction that an instrument shall be construed most strongly against its draftsman. *United States v. Seckinger*, 397 U.S. 203, 210, 90 S.Ct. 880, 884, 25 L.Ed.2d 224 (1970) (contract construed most strongly against the United States which drafted it); *Prudence–Bonds Corp. v. State Street Trust Co.*, 202 F.2d 555, 574 (2d Cir.1953); *Wong v. Kennedy*, 853 F.Supp. 73 (E.D.N.Y.1994). The obligation imposed upon "the line" is to supervise its

"passengers." As has been demonstrated above, the alien was divested of his status as a person in transit, *i.e.*, a passenger, when he abandoned the continuation of his journey and sought an extension of his stay by applying for political asylum. The forfeiture of his passenger status also terminated the carrier's custodial obligation toward him. By imposing upon the carrier's custodial obligation extending beyond the alien's passenger status, the Agency exceeded the authority 8 U.S.C. § 1228(c) conferred upon it; namely, entering "into contracts including bonding agreements with transportation lines to guarantee the *passage through the United States in immediate and continuous transit of aliens* destined to foreign countries." 8 U.S.C. § 1228(c) (emphasis added).

As noted above, the Service argues that the adoption of the 1986 User Fee Statute does not shift the responsibility for detaining TWOVs who have requested political asylum because the section of the INA which authorizes the Service to enter into the Transit Agreements survived passage of the Act. However, given that the Transit Agreements do *not* obligate the carriers to detain these aliens pending the disposition of their political asylum applications, the Service's argument regarding the scope of the Act must be rejected. The Service's interpretation of the Act and its regulations is, for all the reasons stated, unreasonable and the policy resulting therefrom, assigning responsibility to Lan–Chile for the detention of asylum seeking TWOV aliens pending the processing of their political asylum applications, exceeds the Service's statutory authority and is in violation of the APA.

---

28. *See also id.* at 389–92. The author argues that the Transit Agreements are not a valid basis upon which the Service can require carriers to bear the responsibility of detention costs for asylum-seeking TWOVs because (i) the agreement itself includes no such obligation; (ii) the airlines do not present asylum seekers to the INS as TWOVs, rather, the aliens present themselves to the INS as asylum seekers thus abandoning their status as TWOV passengers; and (iii) the Transit Agreement provides a remedy for violations of the agreement, namely, having the carrier immediately remove any alien not eligible for TWOV status. The court is in agreement: The Service cannot justifiably rely on the Transit Agreements

as a basis for keeping the carriers financially responsible for the detention costs of asylum-seeking TWOVs.

29. During oral argument, counsel for the Service argued that the court should view the Transit Agreement as a "hold-harmless" contract whereby the carrier is obligated to insure that government funds shall not be expended in connection with the TWOV program. The Transit Agreement, however, nowhere employs the phrase "hold-harmless" and the court cannot insert terms in a contract which are not already in the document.

## B. *Count II*

Lan–Chile submits that the Service's policy in requiring carriers to carry the physical and financial burden of detaining TWOVs pending the determination of their political asylum applications is arbitrary and capricious and in violation of 5 U.S.C. § 706(2)(A). A successful challenge to an agency's decision under the arbitrary and capricious standard of review must demonstrate that the agency,

> relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem [or] offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). As discussed above, an agency's interpretation of its own regulations is entitled to substantial deference, *Cobble Hill Ass'n v. Adams,* 470 F.Supp. 1077, 1084 (E.D.N.Y. 1979) ("The standard of review is primarily one of rationality of government decision making."), but the agency action must be reasonable in light of the terms of the Act and its policies as evidenced by legislative history. *Osorio v. Immigration and Naturalization Service,* 18 F.3d 1017 (2d Cir. 1994).

Apart from the arguments cited above, Lan–Chile also argues that the INS policy is irrational and hence arbitrary and capricious because the practical result of the policy is to turn corporations, which are ill-equipped to handle the task, into private jailers for asylum seeking TWOVs, whereas excludable aliens such as those who are without appropriate documentation are paroled on a daily basis. Lan–Chile also stresses that carriers are innocent victims of the misrepresentations of the aliens in this case; that the detention policy is punitive because it does not spread the cost of detaining the aliens among all carriers who pay the fee mandated by the 1986 User Fee Statute; and that there is a surplus of funds generated by the 1986 User Fee Statute and hence INS can not claim that it lacks funds to pay for the detention of these aliens. Lan–Chile's Memorandum of Law at 19–22.

■ I agree. It is unreasonable and illogical to compel private corporations to be the jailers of certain excludable aliens for unlimited amounts of time when there is a fund established by Congress for reimbursing the Attorney General for detaining excludable aliens which, the INS concedes, include ineligible TWOVs.[30] Moreover, as discussed above, the dangers of turning private corporations into jailers is significant and was noted by Congress when it decided to pass the 1986 User Fee Statute. The Service argues that the costs associated with mandatory private jailing is a risk freely adopted by the carriers and is outweighed by the revenues generated by the program.[31] This argument is flawed for two reasons: (1) the carriers assumed the responsibility for detaining TWOVs who were in transit through and from the United States, but not the risk of responsibility for detaining, indefinitely, excludable aliens, and (2) the passage of the 1986 User Fee Statute shifted the responsibility of detaining "excludable aliens" to the Government, and therefore it is a risk which Congress has determined the carriers should not take.

The differentiation between stowaways and TWOVs as recognized by the district courts in *Dia Navigation* and *Argenbright,* and the implication of that differentiation for assigning responsibility for the expense of deten-

---

**30.** Although not relevant to the issue before the court, it may be interesting to contemplate the liability of the carrier to a person who was injured by the negligence or intentional tort of an escaped asylum seeking TWOV; or the liability of the carrier to a detainee who claimed that he did not receive proper or adequate medical attention; or a detainee who became ill from food supplied by the carrier which was contaminated. In the context of *this* case, it may be pertinent to inquire whether the scope of such responsibility was contemplated by Congress or by the INS regulations when companies whose business was transportation were compelled to become jailers.

**31.** "During the past five years, plaintiff Lan–Chile has transported over 3,000 aliens to the United States as part of the [TWOV] program." INS's Reply Memorandum of Law at 1.

tion between the carrier and the INS, should be as obvious as it is logical. It is reasonable to place responsibility upon the carrier for a careful inspection of all the spaces of its vessel or aircraft to assure that those spaces are not occupied by persons who have not been cleared for boarding. It is not reasonable to place responsibility upon the carrier for the state of mind of a person properly cleared to occupy its spaces.

In sum, the arguments outlined above regarding the scope of the 1986 Act, the regulations promulgated thereunder, and the Transit Agreement, together with the factors listed above, drive this court to the conclusion that the agency action in this case is arbitrary and capricious and in violation of the APA.[32]

The court is mindful of the view that a judge should not second guess legislative or administrative determinations. In arriving at the conclusion to which it was irresistibly drawn, the court does not believe it is doing so. Rather, it is confident in the belief that it is effectuating the legislative and administrative determinations as they are reflected in the composite of statutes and regulations heretofore discussed at some length.

IV. *Reimbursement*

The two courts which have looked at the issue of whether private carriers are eligible for monetary relief in the stowaway context have concluded that any recovery for damages sustained by the carriers because of the INS policy being challenged (*e.g.*, the costs to a motel or a private security firm) would be money damages for which 5 U.S.C. § 702 does not provide a waiver of sovereign immunity. Both the district court and the Third Circuit in *Dia Navigation* concluded that, in the stowaway context, the carriers are not eligible for the relief requested because the

1986 User Fee Statute neither mandates payment to the private carriers for the detention costs of asylum-seeking stowaways, nor does it create an entitlement to the funds being sought.

The district court in *Dia Navigation* reasoned as follows:

Despite [plaintiff's] argument to the contrary, the claims for reimbursement of detention expenses constitute money damages for which 5 U.S.C. § 702 does not provide a waiver of sovereign immunity. As the Supreme Court and other cases have indicated, a monetary reward will constitute specific or equitable relief only when a plaintiff is entitled to payment of such a monetary award by the statute under which suit is bought. *Bowen v. Massachusetts*, 487 U.S. 879, 900 [108 S.Ct. 2722, 2735, 101 L.Ed.2d 749] (1988).

In this case, the INA neither entitles a carrier to monetary relief nor authorizes the payment of any funds to a carrier. Thus, despite the fact that [plaintiff] describes its claim as one for "reimbursement," this is not a case such as *Beverly Hospital v. Bowen*, 872 F.2d 483 (D.C.Cir. 1989), in which the statute provides a specific right to reimbursement or eligibility for any other monetary award.

*Dia Navigation*, 831 F.Supp. at 379 (citations omitted). On appeal, the Third Circuit agreed:

In this case the reimbursement Dia seeks falls squarely within the category of "monetary damages" as prior case law has defined that term. The INA simply does not speak to the question of responsibility for the costs of detention of stowaways who apply for asylum. Thus there is no statutory entitlement to these funds.

**32.** The court has noted that two district courts have reached the opposite conclusion; that is, that the Service's policy of requiring carriers to detain stowaways pending the determination of their political asylum applications was not an abuse of agency discretion. *Dia Navigation*, 831 F.Supp. at 377 n. 35, *rev'd on other grounds sub nom., Dia Navigation Co. v. Pomeroy*, 34 F.3d 1255 (3d Cir.1994); *Argenbright*, 849 F.Supp. at

282. However, as has also been noted, both cases dealt with *stowaways*, not TWOVs seeking asylum, and both courts acknowledged that stowaways are a disfavored category of aliens who are accorded special treatment elsewhere in the INA and hence can be considered de facto "excluded" aliens irrespective of their applications for political asylum. Such is not the case with TWOVs.

*Dia Navigation,* 34 F.3d at 1267.[33]

■ Lan–Chile, however, urges that even though the relief it requests is money (*i.e.,* reimbursement for the funds expended in detaining the TWOVs), this court should construe the complaint as one seeking equitable relief for which 5 U.S.C. § 702 does provide a waiver of sovereign immunity[34] because, although the 1986 User Fee Statute does not mandate payment directly to the private carriers, it creates an entitlement to the funds which Lan–Chile expended in detaining TWOVs as they awaited the processing of their political asylum applications. I agree.

In *Dia Navigation,* the Third Circuit determined that there was no waiver of sovereign immunity because the 1986 User Fee Statute did not create an entitlement to the monetary relief sought *in the context of stowaways.* The court explained: "The INA simply does not speak to the question of responsibility for the costs of detention of stowaways who apply for asylum. Thus there is no statutory entitlement to these funds." *Dia Navigation,* 34 F.3d at 1267. The crucial difference in this case, however, is that the 1986 User Fee Statute *does* speak to the question of responsibility for the costs of detaining TWOVs who request asylum: The Act places the responsibility on the Attorney General for detaining "excludable aliens." TWOVs who request political asylum are "excludable aliens," and because TWOVs are not restricted by the same procedural roadblocks as are stowaways (they are allowed asylum hearings and appeals), they are not "excluded" aliens for purposes of Section 1227 of the INA. Following the rationale of *Bowen v. Massachusetts,* 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), this clear Congressional directive creates an entitlement to the funds expended by Lan–Chile and therefore the relief requested by plaintiff is not "money damages" as that term is used in the APA.[35]

*Bowen v. Massachusetts, supra,* is instructive and merits extended discussion. In that case, *Massachusetts* was reimbursed by the Government's Department of Health and Human Services ("HHS") for expenditures made in connection with that state's Medicaid Program. HHS subsequently disallowed the reimbursements. The state filed suit in the Federal District Court seeking declaratory relief which if granted, would set aside the disallowance decision. One of the issues before the Court was whether 5 U.S.C. § 702 foreclosed judicial review of the disallowance decision. That statute provides, in relevant part:

> An action in a court of the United States seeking relief *other than money damages* and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party. (Emphasis added).

More specifically stated, would the reversal of a disallowance decision be properly characterized as an award of "damages?" In addressing that issue the Court wrote, at pages 893–94:

> Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an

**33.** The district court in *Argenbright* held that it need not reach this issue because of its determination that the carrier is responsible for the detention costs of stowaways who seek political asylum. *Argenbright,* 849 F.Supp. at 283.

**34.** This statute provides in relevant part that,

  A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages ... shall not be dismissed nor relief there-

in be denied on the ground that it is against the United States or that the United States is an indispensable party.
5 U.S.C. § 702.

**35.** The court notes that if it had reached the conclusion that Lan–Chile could not recover the funds expended in detaining these TWOVs, the carrier would be without a remedy: The court in *Aerolineas Argentinas v. United States,* 31 Fed.Cl. 25 (1994), has determined that the Tucker Act does not give the United States Court of Federal Claims jurisdiction over a suit for money expended by private carriers in detaining TWOVs who have requested political asylum.

injury to his person, property, or reputation—and an equitable action for specific relief—which may include an order providing for the reinstatement of an employee with backpay, or for "the recovery of specific property *or monies,* ejectment from land, or injunction either directing or restraining the defendant officer's actions." ... The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as "money damages." Thus, we have recognized that relief that orders a town to reimburse parents for educational costs that Congress intended the town to pay is not "damages":

\* \* \* \* \* \*

In this Court, the Town repeatedly characterizes reimbursement as "damages," but that simply is not the case. Reimbursement merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance.... *School Committee of Burlington v. Department of Education of Massachusetts,* 471 U.S. 359, 370–371 [105 S.Ct. 1996, 2003, 85 L.Ed.2d 385] (1985).

■ The relief the plaintiff seeks here is for a declaratory judgment and an order requiring the defendant to reimburse it for the monies it expended and which should have been paid in the first instance by the defendant. What the plaintiff is seeking is equitable relief and though, if successful, would require the federal government to pay a sum of money the relief it seeks is not money damages. Quoting favorably and at length from *Maryland Department of Human Resources v. Department of Health and Human Services,* 763 F.2d 1441 (D.C.Cir. 1985), the court repeats what Judge Bork wrote there, namely, that "[d]amages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" D. Dobbs, *Handbook on the Law of Remedies* 135 (1973). 763 F.2d at 1446. That analysis is applicable here. The plaintiff seeks that the government reimburse it for that which the government

should have paid all along. It asks not for a substitute for the expenditures it was compelled to make but for the return of those expenditures to which they claim an entitlement.

Also instructive is the recent case of *Katz v. Cisneros,* 16 F.3d 1204 (Fed.Cir.1994). In *Katz,* a proposal by the plaintiff to provide low-income rental units in Springfield, Massachusetts was approved and, pursuant to a contract between the plaintiff and a federal agency, the tenant and the agency were obligated to pay a certain fixed rent known as "contract rent." The contract rents were calculated according to Housing and Urban Development ("HUD") regulations. When HUD conducted an audit and determined that the contract rents being paid to the plaintiff were allegedly too high, the plaintiff brought suit challenging HUD's interpretation of the regulations governing the calculation of these contract rents. The district court determined that it did not have jurisdiction and transferred the claims to the Court of Federal Claims. The district court held that the APA did not confer jurisdiction on the court since there was an adequate remedy in the Court of Federal Claims. The Federal Circuit reversed.

The court in *Katz* held that the essence of the plaintiff's dispute with HUD was not contractual and that traditional money damages were not the appropriate relief. Relying on *Bowen,* the court reasoned that "the relief sought by [the plaintiff] is not money damages, but a declaratory judgment and other equitable relief." *Id.* at 1208. The court wrote:

We see no significant distinction between the kind of relief sought by Massachusetts in *Bowen* and that sought by [the plaintiff] in this case. Like Massachusetts, [the plaintiff] seeks payment to which it alleges it is entitled pursuant to federal statute and regulations; it does not seek money as compensation for a loss suffered. *It wants to compel HUD to perform the calculation of contract rents in accordance with 24 C.F.R. § 882.408 and other applicable regulations. That a payment of money may flow from a decision that HUD has erroneously interpreted or ap-*

*plied its regulation does not change the nature of the case.*

*Id.* (emphasis added). The court also concluded that the Court of Federal Claims would not have jurisdiction over the action because "[a]n adjudication of the lawfulness of HUD's regulatory interpretation will have future impact on the ongoing relationship between the parties [and] [t]he Court of Federal Claims cannot provide this relief." *Id.* at 1209.[36] The court reasoned that, as with the situation in *Bowen* where the state of Massachusetts sought a reimbursement for federal aid wrongly withheld, "once the propriety of HUD's interpretation of the regulation has been adjudicated it will act accordingly, and any monetary consequences will flow through the contractual scheme." *Id.*

This case also involves a challenge to an erroneous interpretation of a statute and its regulations by a federal agency which has resulted in a private party being forced to expend funds which it would not have had to expend had the agency acted properly. As in the case in *Katz,* the statute and regulations at issue here created a right of reimbursement to the funds which Lan–Chile was forced to expend because of agency action. The court in *Katz* wrote that "no relief is available in the Court of Federal Claims here because the case challenges the interpretation of law *which controls payment to [the plaintiff]."* *Id.* (emphasis added). So too in this case: The interpretation of the 1986 User Fee Statute, its regulations, and the Transit Agreement, control payment to the carrier because the Service was mandated by the Act to reimburse the Attorney General for funds expended in detaining excludable aliens; had the Attorney General discharged her responsibilities, Lan–Chile would not have borne the cost of detaining its asylum-seeking TWOVs. As in *Katz,* Lan–Chile challenges the Service's interpretation of a statute which requires the carrier to make substantial expenditures; had the statute been honored, those expenditures would not have been made.

The fact that the 1986 User Fee Statute does not specifically mandate payment to private parties in the context of detaining asylum-seeking excludable aliens is not dispositive. For example, in *Zellous v. Broadhead Associates,* 906 F.2d 94 (3d Cir.1990), the plaintiff tenants sought to enforce both prospectively and retrospectively the mandate in 42 U.S.C. § 1437a(a)(1) (the Brooke Amendment) which stated that tenants could be charged as rent no more and no less than 30 percent of their income. When HUD failed to make timely adjustments in the tenants' utilities allowance (thus causing the tenants to pay a higher share of their income as rent than is permitted by the Brooke Amendment), the tenants brought suit seeking declaratory, injunctive and monetary relief, or in the alternative, restitution. The Third Circuit, in reversing the district court, held that, even though the Brooke Amendment did not mandate direct payment to the plaintiff tenants, the relief they sought was not "money damages" because

> [i]n this case, [r]eimbursement merely requires [HUD] to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it [implemented timely utility allowance adjustments] . . . .
>
> Following the direction of the Court in *Bowen,* we conclude that the tenants seek only that to which they were entitled under the Brooke Amendment and thus the relief requested is "other than money damages." 5 U.S.C. § 702.

*Id.* at 99 (citations and internal quotations omitted). The same analysis is applicable here: Even though the 1986 User Fee Statute does not direct payment directly to private carriers for expenses incurred in detaining asylum-seeking TWOVs, reimbursement merely requires the Service to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it followed the directives of the 1986 User Fee Statute.[37] Therefore, the relief

---

**36.** As noted above in footnote 25, at least one court has held that the damages are not available in the Court of Federal Claims for moneys expended in detaining asylum-seeking TWOVs.

*Aerolineas Argentinas v. United States,* 31 Fed.Cl. 25 (1994).

**37.** In reaching the opposite conclusion, the court in *Dia Navigation* noted its earlier decision in

requested is "other than money damages" and 5 U.S.C. § 702 does not represent a bar to plaintiff's recovery.

 In its 3(g) Statement, Lan–Chile states that it expended a total of $620,678.78 in providing detention services for the asylum-seeking TWOVs in this action. Lan–Chile's 3(g) Statement, ¶ 17. The Service "disputes the facts" stated in paragraph 17 of plaintiff's 3(g) Statement, INS's Response to Lan–Chile's 3(g) Statement at 3, but it offers no affidavits or other evidence calling into doubt the accuracy of plaintiff's representation. Furthermore, it has not, pursuant to Federal Rule of Civil Procedure 56(f), requested additional time for discovery on this issue. In opposing a properly supported summary judgment motion, "an adverse party may not rest upon the mere allegations or denials of [its] pleading, but [its] response, *by affidavits or as otherwise provided in this rule,* must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e) (emphasis added). A mere denial in a 3(g) Statement cannot, therefore, defeat this prong of plaintiff's motion for summary judgment.[38]

### CONCLUSION

For the foregoing reasons, this court concludes as follows:

1. Plaintiff's motion for summary judgment on Count I is hereby granted and the court makes the following declaratory judgment: Any action by the Immigration and Naturalization Service, or any interpretation of the 1986 User Fee Statute and its regulations by that agency, which results in Lan–Chile remaining financially and physically responsible for the detention of TWOVs awaiting the processing of their applications for political asylum is in excess of the agency's statutory authority, is not in accordance with the 1986 User Fee Statute, and is therefore in violation of the Administrative Procedures Act.

2. Plaintiff's motion for summary judgment on Count II is hereby granted and the court makes the following declaratory judgment: Any action by the Immigration and Naturalization Service, or any interpretation of the 1986 User Fee Statute and its regulations by that agency, which results in Lan–Chile remaining financially and physically responsible for the detention of TWOVs awaiting the processing of their applications for political asylum is arbitrary and capricious and in violation of the Administrative Procedures Act.

3. Plaintiff's motion for an order requiring the Immigration and Naturalization Service to reimburse Lan–Chile for amounts that Lan–Chile has paid or may become obligated to pay in connection with the detention of TWOVs who are awaiting the processing of their applications for political asylum is granted. The Immigration and Naturalization Service is therefore ordered to pay plaintiff $620,678.78, plus interest.

SO ORDERED.

---

*Zellous, Dia Navigation,* 34 F.3d at 1266, but distinguished it and other authorities on the ground that the INA does not specifically address the issue of who is responsible for the cost of detaining asylum-seeking *stowaways.* As noted throughout this memorandum and order, there are significant differences between the treatment of TWOVs and stowaways and therefore the blanket statement in the Act which directs government responsibility for the detention of "excludable aliens" means that the Act does, in fact, "speak to the question of responsibility for the costs of detention of [TWOVs] who apply for asylum," *id.,* and hence there is a statutory entitlement to these funds.

**38.** The INS argues, however, that because the conditions under which Lan–Chile places these

TWOVs are exclusively within the control of plaintiff, the Service "should not be required at this juncture to provide specific evidence in rebuttal." INS's Reply Memorandum of Law at 1 n. 3. This argument is meritless. Under the well-established rules governing motions for summary judgment, a party cannot rest on its mere denials but must come forward with *facts* upon which a court can determine that there are genuine and material issues of disputed fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The Service has not done this and hence there is no impediment in reaching the determination that the amounts submitted by Lan–Chile are accurate.