65 F.3d 1034
 LINEA AREA NACIONAL DE CHILE S.A., d/b/a Lan-Chile Airlines,
Plaintiff-Appellee,
v.
Doris MEISSNER, Commissioner of Immigration and
Naturalization Service, United States Department
of Justice, Defendant-Appellant.
 No. 1540, Docket 94-6288.
 United States Court of Appeals,
Second Circuit.
 Argued May 16, 1995.
Decided Sept. 11, 1995.
 
 Scott A. Dunn, Assistant United States Attorney, Eastern District of New York, Brooklyn, NY (Zachary Carter, United States Attorney, Eastern District of New York, Deborah B. Zwany, Assistant United States Attorney, Eastern District of New York, on the brief), for defendant-appellant.
 David H. Coburn, Steptoe & Johnson, Washington, DC (Laurence A. Short, Steptoe & Johnson, Washington, DC, Celestino Pena, Miami, FL, on the brief), for plaintiff-appellee.
 Before: FEINBERG, ALTIMARI, and MAHONEY, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 Defendant-appellant Doris Meissner, Commissioner of the Immigration and Naturalization Service ("INS" or "the Commissioner") appeals from a decision of the district court, Linea Area Nacional de Chile v. Sale, 865 F.Supp. 971 (E.D.N.Y.1994), granting summary judgment to plaintiff-appellee Linea Area Nacional de Chile, S.A. ("Lan-Chile"). In light of the 1986 amendments to the governing statute, Lan-Chile challenged INS's policy of requiring common carriers to bear the burden of costs associated with the detention of certain passengers. Pursuant to a longstanding contract with INS, Lan-Chile is permitted to bring into the United States aliens who intend only to pass through en route to other countries. In accordance with the INS-carrier contract, these passengers, unlike other aliens entering the United States, are not required to have visas. When such a passenger seeks asylum in the United States, however, INS requires the common carrier to pay the costs of detaining the passenger pending resolution of the matter, a period that often lasts several months. Lan-Chile maintains that Congress intended, through the 1986 amendments to the Immigration and Nationality Act ("INA"), 8 U.S.C. Sec. 1101 et seq., to shift the burden of detaining such passengers from the common carriers to INS and, accordingly, that INS's policy violates the Administrative Procedure Act ("APA"), 5 U.S.C. Sec. 702.
 
 
 2
 Because we think plain Congress's intent to transfer to INS the burdens of detaining those passengers in transit without visas who seek asylum, we affirm the judgment of the district court. We affirm also the district court's determination that the limited waiver of sovereign immunity in 5 U.S.C. Sec. 702 permits reimbursement to Lan-Chile for the expenses it incurred in connection with the detention of its former passengers.
 
 Background
 
 3
 The facts relevant to this appeal are not in dispute. On three occasions between September 3, 1990 and December 19, 1992, several aliens arriving at John F. Kennedy Airport ("JFK") aboard a Lan-Chile aircraft, destined for Seoul, South Korea, requested political asylum. The passengers were brought to the United States pursuant to a contract between the airline and INS, namely the Form I-426 Immediate and Continuous Transit Agreement ("the Agreement" or "Form I-426"). The Agreement, which either party could cancel upon ten days notice, enabled Lan-Chile to bring into the United States aliens who did not have documentation allowing them to "enter" this country. Such aliens fall under the Transit Without Visa program authorized by Form I-426 and are called "TWOVs." Hundreds of common carriers currently have identical contracts with INS. See 8 C.F.R. Sec. 238.3(b) (1995).
 
 
 4
 As each group of TWOVs arriving on Lan-Chile flights requested asylum, INS ordered Lan-Chile to assume physical and financial responsibility for the aliens pending determination of their applications. To this end, Lan-Chile hired a private security firm which provided 24-hour armed guard at a hotel paid for by the airline. Lan-Chile also paid for food and medical attention during the detention period, which lasted a minimum of four months in each case. In addition, the airline had to address any contingency that might arise, such as an attempted escape by a detainee. The record demonstrates that at least one serious such incident occurred during the months of detention.
 
 
 5
 INS rejected the airline's claim that it should bear the costs (some $620,000) associated with the detentions. On June 15, 1993, Lan-Chile filed a complaint in the United States District Court for the Eastern District of New York seeking (1) a declaration that INS's policy of holding common carriers liable for the detention of TWOVs who seek asylum exceeded the agency's statutory authority and violated the APA; (2) a declaration that INS's policy was arbitrary and capricious in violation of the APA; and (3) an order directing INS to reimburse Lan-Chile for past or future expenditures in connection with the detentions. The district court granted summary judgment to Lan-Chile on September 14, 1994. INS now appeals.
 
 
 6
 1. Pre-1986 Statutory and Regulatory Landscape
 
 
 7
 Until 1986, 8 U.S.C. Sec. 1223--section 233 of the Immigration and Nationalization Act--provided that common carriers were responsible for the detention expenses of aliens temporarily detained at INS's insistence. In relevant part, the statute provided:
 
 
 8
 (a) Upon the arrival at a port of the United States of any vessel or aircraft bringing aliens ... the immigration officers may order a temporary removal of such aliens for examination and inspection.... A temporary removal of aliens from such vessels or aircraft ... shall be made by an immigration officer at the expense of the vessels or aircraft or transportation lines....
 
 
 9
 (b) Whenever a temporary removal of aliens is made under this section, the vessels or aircraft ... shall pay all expenses of such removal to a designated place for examination and inspection ... and all expenses arising during subsequent detention, pending a decision on the aliens' eligibility to enter the United States....
 
 
 10
 8 U.S.C. Sec. 1223 (1970) (repealed Pub.L. No. 99-500, 100 Stat. 1783-56 (1986)). Relying principally on this statute, INS had required carriers to assume the responsibility for detaining and paying the related expenses of, among others, the class of aliens at issue here.
 
 
 11
 In addition, the Commissioner enjoyed the "power to enter into contracts including bonding agreements with transportation lines to guarantee the passage through the United States in immediate and continuous transit of aliens destined to foreign countries." 8 U.S.C. Sec. 1228(c) (West Supp.1995) (formerly 8 U.S.C. Sec. 1228(d) (1970)). Pursuant to this authority, INS entered into the Agreement which obligated Lan-Chile to pay the deportation costs of aliens "found ... not to be eligible for passage through the United States in immediate and continuous transit." Form I-426 further directed that TWOV passengers "be detained in quarters provided or arranged for by the [carrier], in the custody of immigration officers of the United States or such other custody as the Commissioner may approve...." Finally, pursuant to the Agreement, Lan-Chile agreed to reimburse the United States "for salaries and expenses of Immigration officers of the United States during such times as they are actually employed in maintaining custody of such alien passengers."
 
 
 12
 INS also formulated regulations that set conditions for the TWOV program, including the requirement that common carriers assume the burden of the "continuous actual custody" of the alien:
 
 
 13
 An applicant for admission under the transit without visa privilege must establish that he is admissible under the immigration laws; that he has confirmed and onward reservations to at least the next country beyond the United States, and that he will continue his journey on the same line or a connecting line within 8 hours after his arrival.... The privilege of transit without a visa may be authorized only under the conditions that the transportation line, without the prior consent of the [INS], will not refund the ticket which was presented ... as evidence of the alien's confirmed and onward reservations; that the alien will not apply for extension of temporary stay or for adjustment of status under section 245 of the Act, and that until his departure from the United States responsibility for his continuous actual custody will lie with the transportation line which brought him to the United States....
 
 
 14
 8 C.F.R. Sec. 214.2(c)(1) (1995). A regulation to this effect has existed since 1973. See 38 Fed.Reg. 24891 (Sept. 11, 1973).
 
 2. The 1986 Amendments to the INA
 
 15
 On October 30, 1986, Congress repealed INA section 233, the specific and principal statutory authority enabling the Commissioner to make the carriers liable for the detention expenses of TWOV aliens. Congress also modified section 232, shifting the burden of responsibility for aliens detained for health reasons from the carriers to INS. 8 U.S.C. Sec. 1222 (amended Pub.L. 99-500, 100 Stat. 1783-56 (1986), as renumbered and amended Pub.L. 100-525, 102 Stat. 2615 (1988)). At the same time, Congress amended section 286. See 8 U.S.C. Sec. 1356 (1988) (the "User Fee provisions"). The User Fee provisions directed the Attorney General to collect $5 (raised to $6 in 1993, see 8 U.S.C. Sec. 1356(d), as amended by the Department of Commerce, Justice and State, the Judiciary, and Related Agencies Appropriation Act, Pub.L. No. 103-121, 107 Stat. 1153, 1160-61 (1993 Amendment)) per passenger arriving at a United States port of entry to cover the cost of immigration inspection. 8 U.S.C. Sec. 1356(h)(2)(A) (West Supp.1995). Congress further instructed the Attorney General to deposit the funds into a segregated account of the United States Treasury ("the User Fee Account") to pay her related expenses:
 
 
 16
 The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General in providing immigration inspection and preinspection services for commercial aircraft or vessels and in--
 
 
 17
 * * * * * *
 
 
 18
 (v) providing detention and deportation services for: excludable aliens arriving on commercial aircraft and vessels.
 
 
 19
 Id. (At the time of briefing, the User Fee Account contained between $40 and $50 million dollars.)
 
 
 20
 Those individuals defined as "excludable" aliens under the Act, for whose detention expenses Congress thus authorized reimbursement to the Attorney General, include anyone who "by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or entry into the United States...." 8 U.S.C. Sec. 1182(a)(6)(C)(i).
 
 
 21
 The 1986 amendments affected only portions of the governing statute. Specifically, the statutory changes left intact the Commissioner's ability to enter into Transit Agreements with common carriers. See 8 U.S.C. Sec. 1228(c).
 
 3. Post-Amendment Regulatory Provisions
 
 22
 After the amendments, INS devised new regulations. INS has conceded that the 1986 changes "place[d on INS] the responsibility for physical custody of excludable aliens pursuant to former section 233," thus shifting the burden of detaining excludable aliens from the carriers to INS. 54 Fed.Reg. 100 (1989) (Final Rules). See also Immigration User Fee, conforming Amendments NPRM, 53 Fed.Reg. 1791-92 (1988). In 1989, the Commissioner modified her rules in an effort to conform with the legislative directive. See 8 C.F.R. Sec. 235.3(d), revised at 54 Fed.Reg. 100-102 (1989) (INS bears responsibility for detention of aliens who arrive in the United States (1) without documentation allowing entry, (2) holding false documents, or (3) who are otherwise inadmissible).
 
 
 23
 However, the agency specified that it would assume neither custody of passengers presented as TWOVs, see 8 C.F.R. Sec. 235.3(d) ("[INS] will assume custody of any alien subject to detention under Sec. 235.3(b) or (c) of this section, except in the case of an alien who is presented as a Transit Without Visa (TWOV) passenger"), nor the burden of paying the costs of their custody, see 8 C.F.R. Sec. 238.3(c) ("Nothing contained within the provisions of section 286 of the Act shall be deemed to waive the carrier's liability for detention, transportation, and other expenses incurred in the bringing of aliens to the United States...."); see also 54 Fed.Reg. 100-101 (1989) (Final Rules). Thus, notwithstanding the fundamental changes effected by the 1986 amendments, INS continued to require common carriers, including Lan-Chile, to pay the detention costs of those TWOVs who requested asylum. In defense of its policy--aspects of which have been challenged on several occasions, see, e.g., Dia Navigation Co. v. Pomeroy, 34 F.3d 1255, 1266-67 (3d Cir.1994) (rejecting ocean carrier's argument that User Fee Statute requires INS to pay costs of stowaway detention); Argenbright Sec. v. Ceskoslovenske Aeroline, 849 F.Supp. 276, 281-83 (S.D.N.Y.1994) (stowaways are "excluded" rather than "excludable" aliens, thus INS policy requiring carriers to bear burden of detention is permissible); see also Aerolineas Argentinas v. United States, 31 Fed.Cl. 25, 32 (1994) (air carrier cannot recover TWOV detention expenses under Tucker Act)--INS relied principally on the untouched power-to-contract provision (Sec. 1228(c)), its own regulations and the Transit Agreement.
 
 
 24
 In June 1993, Lan-Chile sued in the United States District Court for the Eastern District of New York to challenge INS's TWOV policy and to seek reimbursement for its expenditures in connection with the three groups of detainees. In a lengthy opinion, the district court found that by seeking political asylum, the TWOVs at issue had become "excludable" aliens, see 8 U.S.C. Sec. 1182(a)(6)(C)(i) (any alien who has willfully or fraudulently misrepresented a material fact is excludable). With respect to the legislative history, the district court found that Congress intended to shift the financial and physical responsibility of detaining excludable aliens to INS, even though the legislative reports did not specifically address the situation of TWOVs who seek political asylum. See 865 F.Supp. at 979, 981-83.
 
 
 25
 The district court agreed with Lan-Chile's claim that INS's policy violated the APA, finding that (1) Congress had not spoken directly to the issue, see 865 F.Supp. at 985; (2) INS's policy was unreasonable because INS policy imposed upon carriers custodial responsibility for excludable aliens despite the 1986 User Fee Act, which was designed to relieve carriers of such responsibility, see id. at 986-87; and (3) it was inequitable to hold the common carriers physically and financially responsible for detaining these particular aliens because: "(i) it would have been impossible to screen the aliens before boarding to determine which aliens planned on seeking asylum; (ii) there are no guidelines for how long a carrier must detain the alien before his or her application is processed; and (iii) it is inconsistent with the statutory and regulatory basis which merely contemplates allowing TWOVs to transit through the country." Id. at 987. The district court found both that INS's policy exceeded the scope of its statutory authority and that the Commissioner's actions were arbitrary and capricious. Id. at 992, 995. Finally, the court held that the doctrine articulated in Bowen v. Massachusetts, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988), permitted reimbursement by INS to Lan-Chile for those expenses the Commissioner should have paid in the first instance. Id. at 996-99.
 
 Discussion
 
 26
 The principal question presented for review is whether, by amending the Immigration and Nationalization Act in 1986, Congress intended to shift from the common carriers to INS the burdens incurred in connection with safeguarding those TWOV passengers who seek asylum. In finding that Congress intended to place those obligations on the Commissioner, we must also analyze whether, consistent with 5 U.S.C. Sec. 702, Lan-Chile may be reimbursed. We believe Lan-Chile is entitled to reimbursement.
 
 Standard of Review
 
 27
 We review the grant of summary judgment de novo. See Grappo v. Alitalia Linee Aeree Italiane, S.p.A., 56 F.3d 427, 431 (2nd Cir.1995). Where the issues are purely legal and there is no disputed issue of fact, summary judgment is appropriate. See, e.g., Vernon v. Cassadaga Valley Cent. School Dist., 49 F.3d 886, 889 (2d Cir.1995). As the district court properly recognized, this case presents no disputed factual issues.
 
 I. Statutory Language is Clear
 
 28
 It is well settled that we review deferentially an agency's construction of the statute that it is charged with administering. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 11, 844, 104 S.Ct. 2778, 2782 n. 11, 2782-83, 81 L.Ed.2d 694 (1984). However, where the language of a statute is clear, both the agency and the court must defer to Congress's intent; it is only where the statute is silent or ambiguous with respect to a particular issue that the court must decide whether the agency's construction of the statute is permissible. See Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781-82; Fulani v. FCC, 49 F.3d 904, 910 (2d Cir.1995).
 
 
 29
 The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.
 
 
 30
 Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9 (citations omitted). In this case, we find it unnecessary to defer to INS because Congress's intent is clear.
 
 
 31
 Until 1986, section 233 of the INA provided the principal authority for INS to require common carriers to detain any alien ultimately determined to be "excludable." See 8 U.S.C. Sec. 1223(b) (1970) (repealed Pub.L. No. 99-500, 100 Stat. 1783-56 (1986)). But section 233 was repealed in 1986. At the same time, Congress enacted 8 U.S.C. Sec. 1356, creating a funding source to, among other things, "provid[e] detention and deportation services for: excludable aliens arriving on commercial aircraft and vessels...." 8 U.S.C. Sec. 1356(h)(2)(A)(v). By simultaneously repealing Sec. 233 and enacting Sec. 1356, Congress made clear its intention to shift the burden of detaining passengers initially presented as TWOVs from the common carriers to INS. Accord Pomeroy, 34 F.3d at 1263 ("Congress clearly wished to shift the bulk of financial responsibility for detention to INS....").
 
 
 32
 TWOVs who seek asylum become "excludable aliens" by virtue of repudiating their status as TWOVs. Congress has plainly stated that an alien is excludable "who, by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or entry into the United States...." 8 U.S.C. Sec. 1182(a)(6)(C)(i). As the district court properly found, 865 F.Supp. at 979, TWOVs who repudiate their onward tickets have gained entry to this country by willful misrepresentation of their intention to depart on their scheduled flights. Indeed, when asked by Judge Glasser whether the kind of alien in this case "was an excludable alien," INS responded, "A specific type of excludable alien, yes...." Tr. of Oral Arg. in Distr. Ct at 26. See also United States v. Kavazanjian, 623 F.2d 730, 738 (1st Cir.1980) (alien who adopts TWOV status solely for purpose of arriving at this country's borders has perpetrated fraud on United States and has circumvented TWOV program); Aerolineas Argentinas, 31 Fed.Cl. at 28 ("A TWOV who violates the TWOV requirements is excludable."). Further, INS's own regulations provide that the privilege of travelling as a TWOV is granted only to those who "will not apply for extension of temporary stay or for adjustment of status under section 245 of the Act...." 8 C.F.R. Sec. 214.2(c)(1) (1994). Thus, INS's own regulations suggest that TWOV status is rescinded when a TWOV seeks asylum. Therefore, as is clear from the statute and INS's own concessions, those TWOV passengers who disavow their intention to promptly depart the country are excludable aliens within the meaning of the statute because they fall within the definition under 8 U.S.C. Sec. 1182(a)(6)(C)(i), and they may no longer be defined as TWOVs by INS regulation.
 
 
 33
 Accordingly, we examine Congress's intent with respect to the detention of excludable aliens. Section 286 provides that the funds in the User Fee account shall be used for, among other things, "providing detention and deportation services for [ ] excludable aliens arriving on commercial aircraft and vessels...." 8 U.S.C. Sec. 1356(h)(2)(A)(v) (1988). This statute makes clear that INS must expend funds on detention and deportation of excludable aliens. Indeed, INS has conceded this point as well. When asked by the district court whether the statute provided any basis "for compelling the carrier to take custody of [excludable aliens]," INS responded, "[N]ot generally for excludable aliens." Tr. of Oral Arg. in Distr. Ct. at 25; see also 54 Fed.Reg. 100 (1989) (Final Rules) ("section 206 of Pub.L. 99-591 ... places responsibility for physical custody of excludable aliens pursuant to former section 233 of the [INA] ... on the [INS]"). Because we are aware of no congressionally created exceptions to that rule, nor will we infer one, see United States v. Rutherford, 442 U.S. 544, 551-52, 99 S.Ct. 2470, 2474-75, 61 L.Ed.2d 68 (1979) (where language of a statute is clear, court will infer no exception); United Metal Prods. Corp. v. National Bank of Detroit, 811 F.2d 297, 300 (6th Cir.1987) ("as a policy matter, whether an exception should be created is a question for legislative rather than judicial judgment"), cert. dismissed, 485 U.S. 1017, 108 S.Ct. 1494, 99 L.Ed.2d 883 (1988); National Ass'n of Pharmaceutical Mfrs. v. Department of Health and Human Servs., 586 F.Supp. 740, 750 (S.D.N.Y.1984), it is clear that Congress intended INS to pay for the detention and deportation of former TWOVs.
 
 
 34
 Nonetheless, INS insists that unrepealed 8 U.S.C. Sec. 1228(c) permits it to continue to contract with carriers such that the contracting airlines are responsible for the detention of aliens presented as TWOVs. This argument is not persuasive. Section 1228(c), titled "Landing agreements," provides the Attorney General with the "power to enter into contracts including bonding agreements with transportation lines to guarantee the passage through the United States in immediate and continuous transit of aliens destined to foreign countries." We believe that Congress left Sec. 1228(c) untouched in 1986 because that section provides the necessary statutory authority to allow the Commissioner to require common carriers to maintain responsibility for TWOVs during the relatively brief period of a routine layover. Had Sec. 1228(c) been repealed, no provision would allow INS to place that burden upon the airlines. As a matter of statutory construction, however, Sec. 1228(c) cannot authorize the Commissioner to enter into contracts that exceed the bounds of the authority granted her. Cf. Mohasco Corp. v. Silver, 447 U.S. 807, 825, 100 S.Ct. 2486, 2496-97, 65 L.Ed.2d 532 (1980) (agency "interpretation" cannot supersede statutory terms); Pacific Gas & Elec. Co. v. United States, 664 F.2d 1133, 1136 (9th Cir.1981). INS may not sidestep the economic burden clearly placed upon it by Sec. 1356 by contracting out that obligation to the carriers.
 
 
 35
 We also reject INS's contention that it historically has relied not only on repealed Sec. 1223 for the power to require carriers to assume the burden of detaining TWOVs who petition for asylum, but also on unscathed Sec. 1228(c). In support of this proposition, INS points to the "Whereas" introductory clause of Form I-426 which states "WHEREAS section 238(d) of the Immigration and Naturalization Act and Part 238 of Title 8 of the Code of Federal Regulations ... authorize and empower the Commissioner of Immigration and Naturalization ... to enter into contracts...." We think it plain that the invocation of former section 238 sets forth INS's unchallenged general power to contract, and not its controverted power to compel the carriers to detain the subset of TWOVs who petition for asylum. Further, the record is rife with instances in which INS has cited solely Sec. 1223 in support of its actions. See Hearings on Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriation for 1986 before House Subcommittee of the Committee on Appropriations, 99th Cong., 1st Sess. 1230 (1985) (then-INS Commissioner Nelson testified that "[w]hen an alien who appears to be inadmissible has arrived aboard a regular carrier which has entered into a contract with the Attorney General under Section 238 of the Act, the placing of the alien in the custody of the carrier, as authorized by Section 233 of the Act, ordinarily will satisfy the detention requirements of the Statute."); see also id. at 1232 (in response to inquiry as to authority for passing detention costs on to carriers, Commissioner cited section 233); INS Notice of Interim Rule: Detention and Parole of Inadmissible Aliens, 47 Fed.Reg. 30,045 (1982) (citing section 233 as basis for detaining aliens transported under Form I-426).
 
 
 36
 The legislative history further supports our construction of the User Fee provisions. In 1985, the Senate Appropriations Committee noted its concern
 
 
 37
 about the policy of the Immigration and Naturalization Service which requires scheduled passenger airlines to assume custody and financial responsibility for aliens who arrive by plane in the United States without proper documentation....
 
 
 38
 The Committee believes this policy raises significant questions about the equity and legal propriety of requiring private entities to assume the financial burdens of maintaining and, at the same time, exercising physical custody over excludable aliens for extended periods of time. Specifically, the Committee is concerned about the possible ramifications of detention of aliens by airline personnel or their agents who are not, of course, law enforcement officials.
 
 
 39
 S.Rep. No. 150, 99th Cong., 1st Sess. 37 (1985). See also H.R.Rep. No. 197, 99th Cong., 1st Sess. 38 (1985) (same). Similarly, the Appropriations Committee of the House of Representatives stated:
 
 
 40
 The Committee wishes to reiterate concern over this [INS detention] policy and notes its strong support for a change in policy which would require the INS to assume, in all cases, all custodial responsibility and financial responsibility when the transporting air carriers have demonstrated a good faith effort to detect inadmissibility prior to boarding the aircraft.
 
 
 41
 H.R.Rep. No. 669, 99th Cong., 2d Sess. 35 (1986). We conclude from the legislative history that Congress intended to shift physical and fiscal responsibility for all excludable aliens, including the subset of TWOVs at issue here, to the airlines.
 
 
 42
 Further, it is clear that the parties did not contemplate the present situation when they entered into a contractual relationship some thirty years ago. Several years after the parties executed Form I-426, the TWOV program was briefly suspended as a result of concern over increased terrorism. See 38 Fed.Reg. 14962 (June 7, 1973). When the program was reinstated, common carriers were for the first time explicitly required to assume custody of TWOVs. See 8 C.F.R. Sec. 214.2(c)(1) (1994). Notably, the revised regulation also provided that TWOV transit was to last no more than eight hours, or the delay between arrival and "the first available transport." See id. Further, the statute granting aliens the right to request asylum, and establishing procedural protections, was not enacted until 1980, some thirteen years after Lan-Chile and INS entered into the Agreement. See 8 U.S.C. Sec. 1158 (West Supp. II 1990); 8 C.F.R. pt. 208 (1994). We have no trouble concluding that neither the airlines nor INS foresaw, in 1967, that beginning in 1980 passengers could trigger a detention period of several months simply by asking for asylum. Likewise, the airlines could not have contemplated that they would be held responsible for that extended detention. The airlines ultimately acquiesced in INS's permissible interpretation of the INA. Congress, however, remedied this increasingly inequitable situation. In light of the 1986 amendments, and the legislative history, the statute is no longer ambiguous. Congress manifestly intended to place upon INS the burden of detaining excludable aliens; INS's policy of excepting TWOVs who seek asylum is wholly without foundation and contradictory to the mandate of the INA.
 
 
 43
 In concluding that the INA speaks clearly to the question of those TWOVs who petition for asylum, we acknowledge an analogous line of cases arriving at the opposite conclusion. In Dia Navigation Co. v. Pomeroy, 34 F.3d 1255 (3d Cir.1994), the Third Circuit upheld INS's policy of holding common carriers liable for the custody and cost of detaining of alien stowaways, one of several groups of aliens specifically defined as excludable. See also Argenbright, 849 F.Supp. 276, 283 (S.D.N.Y.1994). The court held that neither the statutes nor the regulations provided a clear indication that Congress intended to shift the burden specifically with respect to stowaways. It based its conclusion in large part on the historically disfavored status of stowaways as evidenced by particular INA provisions. See, e.g., 8 U.S.C. Sec. 1323(d) (stowaways may not land, except for temporary medical treatment). Stowaways are thus clearly distinct from other classes of excludable aliens under the INA. This distinction is highlighted by the revealing fact that INS finds the authority to require carriers to assume custody and costs of stowaways not in the freedom-to-contract provision, see Sec. 1228(c), but rather in the "immediate deportation" provisions, see 1227(a)(1).
 
 
 44
 We conclude that the stowaway cases have no direct bearing on our holding. There, courts have determined, upon a different set of statutory mandates, that Congress's intention is at best doubtful with respect to stowaways. In this case, there is no similar statutory suggestion that Congress viewed TWOVs differently than other excludable aliens. Accordingly, unlike the stowaway cases, this issue demands no agency interpretation of the statute and we are not bound to defer to the challenged policy.
 
 
 45
 II. Sovereign Immunity Does Not Preclude Reimbursement to Lan-Chile
 
 
 46
 The Administrative Procedure Act waives sovereign immunity to the extent that it permits suits against the United States "seeking relief other than money damages." 5 U.S.C. Sec. 702 (1977). The Commissioner contends that Lan-Chile seeks money damages that the district court is powerless to grant. INS also maintains that, absent an explicit statutory directive entitling common carriers to payment, no authority exists for such an order. We disagree on both issues.
 
 
 47
 In Bowen v. Massachusetts, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1987), the Supreme Court held that reversing a disallowance decision by the Commissioner of Health and Human Services, resulting in the payment of money by the United States, was not "money damages." 487 U.S. at 893, 108 S.Ct. at 2731-32. The Court noted that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.' " Id. at 893, 108 S.Ct. at 2732. Rather, the relevant inquiry is whether the remedy is a " 'substitute for a suffered loss,' " or " 'the very thing to which [the plaintiff] was entitled' " in the first place. Maryland Dep't of Human Resources v. Department of Health and Human Services, 763 F.2d 1441, 1446 (D.C.Cir.1985) (quoting D. Dobbs, Handbook on the Law of Remedies 135 (1973)); see also Bowen, 487 U.S. at 895, 108 S.Ct. at 2732-33.
 
 
 48
 As in Maryland Dep't of Human Resources, Lan-Chile "is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that [Lan-Chile] will suffer or has suffered by the virtue of the withholding of those funds." 763 F.2d at 1446. See also Katz v. Cisneros, 16 F.3d 1204, 1208 (Fed.Cir.1994) (plaintiff sought payments to which it was allegedly entitled, not "money as compensation for a loss suffered"). We also note that Lan-Chile "seeks judicial interpretation of a federal regulation," rather than a remedy based on a breach of contract claim. See Katz, 16 F.3d at 1209. Were that not the case, we would lack jurisdiction. See id.; 5 U.S.C. Secs. 702, 704.
 
 
 49
 Although Bowen and Maryland Dep't of Human Resources are instructive on the nature of the damages sought, neither case presented the precise question we now face. In each of those cases, a statute specifically required the government agency at issue to make payments for specified items. See Bowen, 487 U.S. at 900, 108 S.Ct. at 2735 (Sec. 1396b(a) of the Medicaid Act provides that the Commissioner "shall pay" states for certain Medicaid services); Maryland Dep't of Human Resources, 763 F.2d at 1444 (42 U.S.C. Sec. 1397a(b) provides that the Commissioner "shall pay" to a state its estimated expenditures in providing social services to low income individuals). In this case, no statute explicitly requires INS to re-pay expenses incurred in detaining former TWOVs. However, in light of the foregoing analysis and our conclusion that Congress shifted the burden of the detention costs of all excludable aliens to the Commissioner from the carriers, it is clear that Congress also intended that INS reimburse carriers for the expenses they incurred as a result of congressionally-repudiated INS policy.
 
 
 50
 Section 1356 addresses the disposition of the funds in the User Fee Account. The funds in the User Fee Account include a $6 tariff collected from every passenger, regardless of citizenship status, entering the United States by aircraft. See 8 U.S.C. Sec. 1356(d). Section 1356, in relevant part, directs that
 
 
 51
 The Secretary of the Treasury shall refund out of the Immigration User Fee Account to any appropriation the amount paid out of such appropriation for expenses incurred by the Attorney General in ... (v) providing detention and deportation services for: excludable aliens arriving on commercial aircraft....
 
 
 52
 8 U.S.C. Sec. 1356(h)(2)(A)(v). Thus, although we do not have congressional language directing the Attorney General (who delegated her authority to INS) to reimburse common carriers for expenses incurred in providing detention services for excludable aliens, we do have congressional language directing that the Secretary of the Treasury reimburse the Attorney General for her expenses in providing related services. In our view it is plain that Congress presumed that the Attorney General, that is, INS, would have in fact incurred detention expenses. That the Commissioner did not incur those expenses in the first instance is no obstacle to a finding that she must assume them now. Congress's intent is clear; we need not twice penalize the carriers for INS's erroneous interpretation of the statute.
 
 
 53
 The Commissioner argues that we should be guided by the Third Circuit decision in Pomeroy. As earlier discussed, that court's holding was premised on its conclusion that the statute did not provide a clear indication of Congress's intent with respect to the financial burden of detention of stowaways pending an asylum decision. See 34 F.3d at 1263. Accordingly, the court held that the APA did not entitle the carrier to recover its expenses because "[t]he INA simply does not speak to the question of responsibility for the costs of detention of stowaways who apply for asylum. Thus there is no statutory entitlement to these funds." See id. at 1267. The court's conclusion that the plaintiff sought "money damages," id., was compelled by its finding that the statute created no entitlement in the common carrier to reimbursement. Accordingly, the wrong perpetrated on the carrier was "not the denial of money to which the INA entitle[d] it, but rather the INS' failure to follow the appropriate procedures in implementing the INA." Id.
 
 
 54
 In this case, however, Lan-Chile was wronged by INS's refusal to pay the detention expenses of those of Lan-Chile's TWOV passengers who, by renouncing their intentions to promptly depart this country, became excludable aliens: "the very thing to which [it] was entitled." Maryland Dep't of Human Resources, 763 F.2d at 1441 (quotation omitted); see also Bowen, 487 U.S. at 895, 108 S.Ct. at 2735. The INA clearly directs that the Commissioner pay the detention expenses of excludable aliens; the aliens at issue are excludable; accordingly, Lan-Chile has a statutory entitlement to reimbursement for its improperly incurred expenses, a claim which is not barred by sovereign immunity.
 
 
 55
 The Third Circuit has reached the same conclusion in a closely analogous situation. In Zellous v. Broadhead Assocs., 906 F.2d 94 (3d Cir.1990), tenants sued the United States Department of Housing and Urban Development ("HUD") and its officials, alleging that the defendants violated, among other things, the APA by their failure to make timely adjustments in the tenants' utilities allowance. As a result of the omission, the tenants paid a higher portion of their incomes as rent than is permissible under federal law. See 906 F.2d at 95. The HUD defendants argued that the tenants sought money damages which were barred by the APA; they also claimed that the federal statute upon which the plea for relief was based could not "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." Id. at 96 (internal quotation omitted). Unlike the Medicaid provisions at issue in Bowen, the statutes in Zellous did not direct payments to the tenants; rather the rent subsidy was provided by government payments made to property owners. See 906 F.2d at 98.
 
 
 56
 We join the Third Circuit in holding that the lack of a statutory requirement that the disputed payments be made directly to the plaintiff does not bar relief: the precise nature of the mechanism by which a plaintiff receives that to which a statute entitles him cannot defeat his entitlement. See id. at 98 ("We do not believe that this scheme of indirect support for tenants transforms the character of the relief they seek into a substitute remedy."). Having concluded that Congress intended that INS bear the burden of detaining and paying for the related expenses of all excludable aliens, including former TWOVs, we also find that Congress waived sovereign immunity to allow vindication of what would otherwise be a hollow victory.
 
 Conclusion
 
 57
 For the foregoing reasons, we affirm the judgment of the district court.